

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE JUL 1 8 2019

CHIEF JUSTICE

This opinion was
filed for record
at 8 a.m on July 18, 2019

for Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 95920-0 |
| Respondent, | ) | |
| v. | ) | En Banc |
| TOMAS MUSSIE BERHE, | ) | |
| Petitioner. | ) | Filed: __JUL 1 8 2019__ |

YU, J.—This case addresses the standards and procedures that apply when trial courts must determine whether an evidentiary hearing is necessary on a motion for a new trial based on allegations that jury deliberations were tainted by racial bias. We recognize that when allegations of juror misconduct arise after the verdict, trial courts have discretion to determine whether an evidentiary hearing is necessary. However, there are limits to that discretion, particularly in cases of alleged racial bias that deprives a defendant of his or her constitutional right to a fair trial by an impartial jury.

A jury convicted petitioner Tomas Berhe of murder and assault. After the trial, juror 6 came forward, alleging that racial bias during jury deliberations influenced the verdict. The trial court denied Berhe's motion for a new trial without an evidentiary hearing, instead relying solely on written declarations prepared with the aid of counsel. This was an abuse of discretion for two reasons.

First, the court did not exercise sufficient oversight of the process, allowing counsel to taint several jurors with inappropriate questions about their deliberations. Second, the court did not conduct a sufficient inquiry before determining that an evidentiary hearing was unnecessary. We therefore vacate the trial court's order denying Berhe's motion for a new trial and remand for further inquiry and other proceedings as necessary.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 22, 2013, multiple gunshots were fired through the closed passenger window of a parked car. One man was killed and another was injured. Witnesses described the shooter as an African-American male, who fled the scene of the shooting in a black sedan. Shortly after, police officers stopped a vehicle matching the witnesses' descriptions and identified Berhe as the shooter. Berhe was charged with first degree murder and first degree assault, each with a firearm enhancement. The case was tried to a jury.

2

*State v. Berhe*, No. 95920-0

During voir dire, the trial court asked the potential jurors "whether anybody has any close friends or relatives that have been accused of a crime or charged with a crime or convicted of a crime." Reporter's Tr. on Appeal (Jan. 25, 2016) at 78. Eleven potential jurors indicated they did. The court then asked if any of those potential jurors "felt you or your close friend or relative was treated unfairly by the criminal justice system." *Id.* at 79. Only juror 6 responded in the affirmative. The court did not ask any follow-up questions at that time.

The next day, the prosecutor followed up with each juror who had indicated they knew someone accused of a crime. When juror 6 was asked, "[D]o you think that you could be a fair and impartial juror in this case?" juror 6 responded, "Probably so, based on the evidence." Verbatim Report of Proceedings (VRP) (Jan. 26, 2016) at 498-99. The prosecutor then asked for more information about the person who she felt was treated unfairly by the criminal justice system. Juror 6 explained that her nephew had been convicted of stealing and that she felt his sentence was unjust. Juror 6 did not mention at the time that her son's friend had been wrongly accused of murder. However, after the trial, two other jurors stated that this was discussed during deliberations.

After the parties exercised their peremptory challenges, 13 jurors were seated, including juror 6. One juror was to be an alternate, and the court and counsel "agreed that we would pick the alternate via random pick, a number out of

3

a jar." VRP (Feb. 24, 2016) at 3346. However, outside the presence of the jury, the court noted for the record that juror 6 was the only African-American juror and stated that "it would be very unfortunate if Juror No. 6 were to be the alternate." *Id.* Therefore, with counsel's agreement, the court removed juror 6's name from the jar, and a different juror was randomly selected to be the alternate.

The jury found Berhe guilty of all the charged offenses. The court polled the jury after the verdict was delivered, asking each juror, "[W]ere these your individual verdicts?" and were they "the verdicts of the entire jury?" VRP (Mar. 1, 2016) at 3364-66. Each juror answered yes to both questions. *Id.*

The next day, juror 6 contacted defense counsel on her own initiative to express concerns about the case, as discussed in more detail below. Juror 6 also contacted the court that day, and "[s]he did express a lot of emotional distress following the jury verdict." VRP (Apr. 6, 2016) at 109. It is not clear from the record whether the trial court was aware of any specific reasons for juror 6's distress. The court's bailiff "got [juror 6] in contact with a counselor, a jury counselor, and she spoke with a counselor." *Id.*

Approximately one week later, Berhe moved to extend time to file a motion for a new trial, asserting that his "right to a fair trial has been materially affected" and requesting "additional time to fully investigate." Clerk's Papers (CP) at 532. Defense counsel stated that the basis for the motion for a new trial would be

4

"[j]uror misconduct and prosecutorial misconduct" but did not elaborate on the nature of the alleged misconduct. *Id.* at 536. The court held a hearing on March 10, 2016, before deciding whether there was good cause for an extension of time.

The court opened by noting the defense claimed "juror misconduct and prosecutorial misconduct. So that's basically all we know." VRP (Mar. 10, 2016) at 3. Defense counsel then elaborated on specific instances of alleged prosecutorial misconduct during various phases of the trial. Regarding the alleged juror misconduct, defense counsel explained that

> we were contacted by—unsolicited—by one juror who indicated that after three and a half days of deliberations, she felt that there was juror misconduct and that she—I guess you could use the word "acquiesced" to a guilty verdict. Against her wishes, ultimately.
>
> So she contacted us very upset, and we need time to get affidavits, investigate that further, and then brief that issue.

*Id.* at 6. The court noted on the record that juror 6 had contacted the court and had been put in touch with a jury counselor, and that the court was aware juror 6 had also contacted defense counsel.

The court "was contacted by another juror, too, [who] said that she was contacted by someone on the defense team, unsolicited." *Id.* at 6-7. Defense counsel acknowledged contacting "most or all of the other jurors," using contact information obtained from juror 6. *Id.* at 7, 22. The State expressed concerns about juror privacy and "the defense conducting a fishing investigation . . . and

going out of their way to contact jurors in an attempt to find what they can label as misconduct." *Id.* at 10. Although the court granted Berhe's motion to extend time, it recognized the State's concerns and stated that the juror who was contacted by the defense "was not happy about being contacted." *Id.* at 11. Noting the difficulty of the trial, the court admonished defense counsel that initiating contact with jurors was not "appropriate." *Id.*[1]

To accommodate both the jurors' privacy and the defense's interest in obtaining more information, the court sent a letter to all the jurors notifying them that "the lawyers would like the opportunity to talk with you." CP at 292. The court assured the jurors that it had advised counsel "nobody should initiate contact with any juror," but it also stated that jurors were free to contact counsel if they wished to do so. *Id.* The letter included contact information for both the defense and the prosecution. The record does not indicate whether the trial court or the State were aware of any allegations of racial bias during jury deliberations at the time this letter was sent.

On March 28, 2016, Berhe filed his motion for a new trial and requested an evidentiary hearing based on alleged prosecutorial misconduct and two types of

---

[1] We have not been asked to review the propriety of this admonishment. However, we do note that in accordance with RPC 3.5(c) and comment 3, a lawyer may communicate with a juror after being discharged in most circumstances. *See also* CrR 7.5(a)(2) (motion for a new trial may be based on "[m]isconduct of the . . . jury," and "[w]hen the motion is made based on matters outside the record, the facts shall be shown by affidavit"); CR 59(a)(2) ("misconduct may be proved by the affidavits of one or more of the jurors").

6

alleged juror misconduct: consideration of extrinsic evidence and racial bias.

Regarding the racial bias claim, Berhe contended that the "jurors' treatment of

Juror #6, the sole African-America[n] juror on the panel, evidenced by the

disparity and derision towards her during deliberations, is clear evidence of an

actual or implied racial bias by one or more members of the jury." *Id.* at 458. This

claim was supported by a written declaration from juror 6, which was presented on

defense counsel's stationery and dated March 25, 2016.

Juror 6 declared, "I did not agree with the verdict on March 1, 2016 and I do

not agree with it now." *Id.* at 474. She explained that "[f]or most of the

deliberations, 8 jurors wanted to vote to convict. The remaining four were either

voting Not Guilty or shifted between Not Guilty and Uncertain." *Id.* at 475.

However, according to juror 6, "I was the only one accused of being 'partial' and

'close-minded' because of my views on acquittal" and "I was repeatedly accused

of being 'partial' because I was the only African-American juror on the panel in a

trial with an African-American defendant." *Id.* Juror 6 was ultimately "the last

hold-out before a verdict was reached" and stated that she "only agreed to the

Guilty verdicts because I felt emotionally and mentally exhausted from the

personal and implicit race-based derision from other jurors." *Id.* at 475-76.

Juror 6 provided examples of this derision, stating that she "tried to discuss

the lack of concrete evidence that Mr. Berhe was the shooter, but other jurors were

7

outright dismissive." *Id.* at 475. Juror 6 "suggested that [Berhe] could have taken the gun from the real shooter," but her "idea was mocked as 'stupid' and 'illogical,'" making her feel "personally ridiculed in a way the other dissenting jurors were not." *Id.* In addition, juror 6 contended that during deliberations,

> one juror pointed out that if [Berhe's] pants were so big and baggy that he had to hold them up to walk down Eastlake, why didn't he do the same when he exited the car during the stop by police. I rhetorically commented, "What would have happened if he did that?" Several of the jurors as a group interpreted that as a comment on police misconduct towards African-Americans and loudly mocked me for my response, while others sat quietly.

*Id.* at 476. Finally, juror 6 said she was reviewing her notes on the morning of March 1, 2016, and two other jurors "surrounded me, taunting: 'She's not going to do anything. She's going to let him walk.' I felt like they were animals and I was their prey. I can only describe it as feeling emotionally and mentally attacked. I felt emotionally abused; so much so that it became debilitating." *Id.* As a result, juror 6 "couldn't handle the pressure of being a hold-out anymore," and the jury delivered its verdict later that day. *Id.*

The State filed a response on April 6, 2016, along with declarations from six other jurors who had contacted the prosecutors. The declarations were all dated either April 3 or April 4, 2016. Each declaration stated that the prosecutors had asked each juror "to answer in my own words the following two questions": (1) "Did you personally do anything to Juror #6 which was motivated by racial bias

8

during deliberations?" and (2) "Did you observe any other juror do anything to Juror #6 which appeared to be motivated by racial bias during deliberations?" *Id.* at 323-28. It is undisputed that these questions were formulated by the prosecutors and sent to the jurors without the court's review.

Predictably, each juror denied observing or doing anything to juror 6 that was motivated by racial bias. However, juror 11 stated that "during deliberations I appreciated some of the insights Juror #6 had, specifically around the norm in hip-hop culture of baggy pants without a belt and the need to hold them up with one's hands." *Id.* at 326. Juror 11 was also made "uncomfortable by the frustration expressed" toward juror 6 by some of the other jurors. *Id.* In addition, juror 13 noted that another juror had directly accused juror 6 of being "bias[ed] based on her history with the law[,] i.e. her nephew who was tried for breaking and entry [who] she felt got too long of a sentence and then her son had a friend who was tried for murder." *Id.* at 325. Nevertheless, juror 13 declared that "there was nothing said or implied that sounded racial." *Id.*

At the hearing on Berhe's motion for a new trial, the court acknowledged juror 6's belief that racial bias played a role in the deliberations, stating, "I understand about implicit bias. But we can't just assume. I think it's equally likely that she felt pressured because she was the lone holdout as she did because of any other reason." VRP (Apr. 6, 2016) at 111. Relying solely on the written

declarations, the court ultimately found that "[t]he only evidence to support juror #6's subjective feeling that she was attacked by her fellow jurors because of her race comes from juror #6's declaration," that "[t]he only evidence that members of the jury were implicitly or explicitly racially bias[ed] or inappropriately considered race comes from juror #6's declaration," and that "[d]eclarations provided by several other jurors refuted many of juror #6's claims." CP at 406-07. The court then concluded "that there is insufficient evidence to conclude that juror misconduct occurred with respect to racism—implicit or explicit" and "Mr. Berhe failed to make a prima facie showing of juror misconduct warranting an evidentiary hearing." *Id.* at 407. The court therefore denied Berhe's request for an evidentiary hearing and his motion for a new trial.

The Court of Appeals affirmed, reasoning that juror 6's declaration "set forth no allegations of racially charged remarks or race-based derision made by the other jurors" and contained only her "subjective impressions" and "a conclusory allegation lacking particularized factual support." *State v. Berhe*, No. 75277-4-I, slip op. at 29, 32 (Wash. Ct. App. Feb. 5, 2018) (unpublished), https://www.courts. wa.gov/opinions/pdf/752774.pdf. We granted review "on the juror bias issue only." Order, *State v. Berhe*, No. 95920-0 (Wash. Nov. 9, 2018).

ISSUE

Whether the trial court abused its discretion by failing to exercise adequate oversight and failing to conduct a sufficient inquiry before denying Berhe's motion for a new trial without an evidentiary hearing.

ANALYSIS

We recognize that trial courts have discretion to determine whether an evidentiary hearing is necessary before ruling on a motion for a new trial. However, we also recognize that when explicit or implicit racial bias is a factor in a jury's verdict, the defendant is deprived of the constitutional right to a fair trial by an impartial jury. In addition, identifying the influence of racial bias generally, and implicit racial bias specifically, presents unique challenges. Courts must account for all of these considerations when confronted with allegations that explicit or implicit racial bias was a factor in the jury's verdict.

Unlike isolated incidents of juror misbehavior, racial bias is a common and pervasive evil that causes systemic harm to the administration of justice. Also unlike other types of juror misconduct, racial bias is uniquely difficult to identify. Due to social pressures, many who consciously hold racially biased views are unlikely to admit to doing so. Meanwhile, implicit racial bias exists at the unconscious level, where it can influence our decisions without our awareness.

Given these unique concerns, courts must carefully control the inquiry when it has been alleged that racial bias was a factor in a jury's verdict. It is essential to ensure that the jurors are not tainted by improper questioning that is likely to elicit defensive responses and impede the fact-finding process. It is also essential that before deciding whether to hold an evidentiary hearing, courts thoroughly consider the evidence and conduct further inquiry if there is a possibility that racial bias was a factor in the verdict.

In this case, the trial court did not sufficiently oversee the process nor did it conduct a sufficient inquiry before denying Berhe's motion for a new trial without an evidentiary hearing. We therefore vacate the trial court's order denying Berhe's motion for a new trial and remand for further proceedings.

A.    Because racial bias raises unique concerns, the no-impeachment rule must yield to allegations that racial bias was a factor in the verdict

"Central to our jury system is the secrecy of jury deliberations." *Long v. Brusco Tug & Barge, Inc.*, 185 Wn.2d 127, 131, 368 P.3d 478 (2016). The no-impeachment rule protects this secrecy "by 'prevent[ing] the jury from divulging what considerations entered into its deliberations or controlled its action[s].'" *Id.* at 132 (alterations in original) (internal quotation marks omitted) (quoting *Gardner v. Malone*, 60 Wn.2d 836, 843, 376 P.2d 651 (1962)). This rule "promotes full and vigorous discussion" during jury deliberations and "gives stability and finality to

12

verdicts." *Peña-Rodriguez v. Colorado*, 580 U.S. ___, 137 S. Ct. 855, 865, 197 L. Ed. 2d 107 (2017).

However, the no-impeachment rule must yield in "cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged." *Warger v. Shauers*, 574 U.S. ___, 135 S. Ct. 521, 529 n.3, 190 L. Ed. 2d 422 (2014). A fair trial before an impartial jury "is a criminal defendant's fundamental 'protection of life and liberty against race or color prejudice.'" *McCleskey v. Kemp*, 481 U.S. 279, 310, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (quoting *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 309, 25 L. Ed. 664 (1880)). An "impartial jury" means "an unbiased and unprejudiced jury," and allowing bias or prejudice by even one juror to be a factor in the verdict violates a defendant's constitutional rights and undermines the public's faith in the fairness of our judicial system. *Alexson v. Pierce County*, 186 Wash. 188, 193, 57 P.2d 318 (1936). As such, this court recognized long ago that "'[a] trial by a jury, one or more of whose members are biased or prejudiced, is not a constitutional trial.'" *City of Seattle v. Jackson*, 70 Wn.2d 733, 738, 425 P.2d 385 (1967) (quoting *Allison v. Dep't of Labor & Indus.*, 66 Wn.2d 263, 265, 401 P.2d 982 (1965)). Racial bias by a juror does not "'inhere in the verdict or impeach it'" and is therefore not protected by the no-impeachment rule. *Id.* (quoting *Allison*, 66 Wn.2d at 265).

13

Eventually, the United States Supreme Court reached the same conclusion, recognizing that unlike most types of jury misconduct, racial bias in jury deliberations is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Peña-Rodriguez*, 137 S. Ct. at 868. In addition, racial bias is less likely to be discovered before trial because "[g]eneric questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations. Yet more pointed questions 'could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.'" *Id.* at 869 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 195, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981) (Rehnquist, J., concurring in result)). Moreover, "[t]he stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." *Id.* Therefore, "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way." *Id.*; U.S. CONST. amend. VI.

The United States Supreme Court has not yet addressed "what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial bias" or "the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a

14

new trial be granted." *Id.* at 870. However, Washington courts have done so, and we do so again in this case.

By the time *Peña-Rodriguez* was decided, Washington had already begun to develop procedures for addressing motions for a new trial based on allegations of racial bias of a juror. *State v. Jackson*, 75 Wn. App. 537, 879 P.2d 307 (1994), *review denied*, 126 Wn.2d 1003, 891 P.2d 37 (1995). After the trial in *Jackson*, a juror filed a written affidavit alleging that during deliberations, another juror (juror X) "would make comments about 'coloreds,'" such as "'[t]he worst part of [a recent] reunion was that I had to socialize with the coloreds,'" and "'[y]ou know how those coloreds are.'" *Id.* at 540. "The context of the comments made it clear that by 'coloreds' [X] meant African-Americans." *Id.* (alteration in original). The defendant, several alibi witnesses, and the juror who brought the allegations were all African-American. The trial court nevertheless denied the defendant's motion for a new trial without an evidentiary hearing.

The Court of Appeals reversed, holding that where a juror's statements during deliberations "create a clear inference of racial bias," there is "a valid issue of juror misconduct." *Id.* at 543. In such a case, "as a matter of due process, the trial court should . . . conduct[ ] an evidentiary hearing before ruling on [a] motion for a new trial" to eliminate any "'lingering doubt about'" whether the defendant had received a fair trial. *Id.* (quoting *State v. Parnell*, 77 Wn.2d 503, 508, 463

15

P.2d 134 (1969), *overruled on other grounds by State v. Fire*, 145 Wn.2d 152, 34 P.3d 1218 (2001)). Had there been an evidentiary hearing in *State v. Jackson*,

> then the parties would have had the opportunity to examine juror X, and the trial court could have made a determination based on its assessment of the juror's responses, credibility, and demeanor whether or not juror X, in fact, held a racial bias such that he could not have decided the case fairly and impartially. Moreover, through further inquiry, the parties could have examined other jurors about whether race played a role during their deliberations, and juror X would have had the opportunity to explain his statements and the context in which they were made.

*Id.* at 544. *State v. Jackson* thus requires courts to hold an evidentiary hearing before ruling on a motion for a new trial when "the moving party has made a prima facie showing of [racial] bias." *Id.* at 543-44.

We reaffirm that *State v. Jackson* sets forth the proper general framework for evaluating allegations of racial bias by a juror. This case presents us with an opportunity to expand on that framework and to clarify how it must be tailored to adequately address allegations of implicit racial bias.

B.     Courts must carefully oversee any inquiry into whether explicit or implicit racial bias influenced a jury verdict

We do not question the general rule that "a trial court has significant discretion to determine what investigation is necessary on a claim of juror misconduct." *Turner v. Stime*, 153 Wn. App. 581, 587, 222 P.3d 1243 (2009). However, a juror's racial bias is uniquely difficult to identify because many people who harbor explicit biases will not admit to doing so, and everyone harbors

16

implicit biases that are difficult to recognize in oneself. *Peña-Rodriguez*, 137 S.

Ct. at 869; *State v. Saintcalle*, 178 Wn.2d 34, 46, 309 P.3d 326 (2013) (plurality

opinion), *abrogated on other grounds by City of Seattle v. Erickson*, 188 Wn.2d

721, 398 P.3d 1124 (2017). Therefore, when a motion for a new trial is based on a

claim of explicit or implicit racial bias by one or more jurors, trial courts must

tailor their approaches to account for the unique challenges presented.

Most importantly, it is essential that once a claim of racial bias is raised,

investigations into allegations of racial bias are conducted on the record and with

the oversight of the court. It is far too easy for counsel, in their role as advocates,

to taint the jurors and impede the fact-finding process. This case provides a perfect

example.

The prosecutors' questions—(1) "Did you personally do anything to Juror

#6 which was motivated by racial bias during deliberations?" and (2) "Did you

observe any other juror do anything to Juror #6 which appeared to be motivated by

racial bias during deliberations?"—were not designed to elicit the truth of whether

racial bias was a factor in the verdict. To the contrary, such "pointed questions

'could well exacerbate whatever prejudice might exist without substantially aiding

in exposing it'" by making the jurors feel accused and defensive. *Peña-Rodriguez*,

137 S. Ct. at 869 (quoting *Rosales-Lopez*, 451 U.S. at 195 (Rehnquist, J.,

concurring in result)). The State rightly conceded as much at oral argument.

Wash. Supreme Court oral argument, *State v. Berhe*, No. 95920-0 (Mar. 19, 2019),

at 27 min., 49 sec. through 28 min., 25 sec., *video recording by* TVW, Washington

State's Public Affairs Network, http://www.tvw.org.

Rather than permitting the parties alone to investigate allegations of racial

bias, once a claim of racial bias is raised, inquiries into the influence of that racial

bias on a jury's verdict must be conducted under the court's supervision and on the

record. Therefore, as soon as any party becomes aware that there are sufficient

facts to support allegations that racial bias was a factor in the verdict, the court and

opposing counsel must be notified.[2] In addition, as soon as a court becomes aware

of allegations that racial bias may have been a factor in the verdict, the court shall

take affirmative steps to oversee further inquiry into the matter and instruct counsel

not to have any further communications with the jurors unless it is on the record

and supervised by the court.

C.     The unique challenge of assessing implicit racial bias requires a searching
       inquiry before a court can decide whether an evidentiary hearing is needed

In addition to overseeing investigations into racial bias by jurors, courts

must tailor their inquiries to the specific allegations presented. In cases like this

---

[2]It is not our intent to interfere with defense counsel's obligation to thoroughly
investigate an irregularity in jury deliberations, or to interfere with counsel's duty of
confidentiality under RPC 1.6. Rather, our primary goal is to protect the integrity of such
investigations and to preserve as much as possible any evidence of racial bias.

one, where the alleged racial bias was apparently largely implicit rather than explicit, courts must account for the unique nature of implicit bias.

1.      Implicit racial bias is a unique problem that requires tailored solutions

As this court has recognized, implicit racial bias can affect the fairness of a trial as much as, if not more than, "blatant" racial bias. *State v. Monday*, 171 Wn.2d 667, 678, 257 P.3d 551 (2011); *see also* GR 37; *State v. Jefferson*, 192 Wn.2d 225, 240, 429 P.3d 467 (2018) (plurality opinion); *Saintcalle*, 178 Wn.2d at 49. However, implicit racial bias can be particularly difficult to identify and address. Nevertheless, as our understanding and recognition of implicit bias evolves, our procedures for addressing it must evolve as well.

Implicit racial bias is neither experienced nor expressed in the same way as explicit racial bias. Explicit racial bias is consciously held, although the biased person may not be willing to admit to having such bias if asked. *See Peña-Rodriguez*, 137 S. Ct. at 869. Implicit racial bias, however, primarily exists at an unconscious level, such that the biased person is unlikely to be aware that it even exists. This occurs because "[i]t is now socially unacceptable to be overtly racist. Yet we all live our lives with stereotypes that are ingrained and often unconscious, implicit biases that endure despite our best efforts to eliminate them." *Saintcalle*, 178 Wn.2d at 46. Implicit racial bias can therefore influence our decisions without

19

our being aware of it "because we suppress it and because we create it anew through cognitive processes that have nothing to do with racial animus." *Id.*

Thus, determining whether a person has been influenced by implicit racial bias is inherently challenging. Courts cannot simply ask the person about it and assess the credibility of his or her response because "people are rarely aware of the actual reasons for their discrimination and will genuinely believe the race-neutral reason they create to mask it." *Id.* at 49. Therefore, a person may honestly believe and credibly testify that his or her actions were not influenced by racial bias, even where implicit racial bias did in fact play a significant role.

Nevertheless, we should not "throw up our hands in despair at what appears to be an intractable problem. Instead, we should recognize the challenge presented by unconscious stereotyping . . . and rise to meet it." *Id.* We have made significant strides toward doing so in the context of jury selection, and our efforts there provide a useful starting point for our efforts here.

"Since 1879, the United States Supreme Court has recognized that race discrimination in the selection of jurors violates the Fourteenth Amendment's guaranty of equal protection." *Id.* at 43 (citing *Strauder*, 100 U.S. at 309-10). However, various tests that were used to identify and eliminate racial discrimination in jury selection proved ineffective because such tests were "equipped to root out only *'purposeful'* discrimination, which many trial courts

probably understand to mean conscious discrimination." *Id.* at 48 (citing *Batson v. Kentucky*, 476 U.S. 79, 98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)). As a result, even though it has been empirically proved that peremptory challenges are routinely exercised in a racially unequal manner, it is exceedingly rare for appellate courts to reverse convictions on that basis. *Id.* at 44-46.

To address this ongoing problem, we adopted GR 37, which goes beyond forbidding purposeful discrimination in jury selection by addressing the influence of implicit racial bias. Rather than requiring a showing of purposeful discrimination, GR 37(e) provides, "If the court determines that an objective observer could view race or ethnicity as a factor in the use of [a] peremptory challenge, then the peremptory challenge shall be denied." In addition, "[f]or purposes of this rule, an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f). Moreover, certain "reasons for peremptory challenges [that] have been associated with improper discrimination in jury selection in Washington State" are "presumptively invalid," including "having a close relationship with people who have been stopped, arrested, or convicted of a crime." *Id.* at (h)(iii).

We now hold that similar standards apply when it is alleged that implicit racial bias was a factor in the jury's verdict. The ultimate question for the court is

whether an objective observer (one who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State) could view race as a factor in the verdict. If there is a prima facie showing that the answer is yes, then the court must hold an evidentiary hearing. *Jackson*, 75 Wn. App. at 543-44.

2. Before deciding whether there is a prima facie showing of racial bias, courts must conduct a thorough inquiry

Unfortunately, for the same reasons that it is difficult to identify implicit racial bias, it can also be difficult to determine when a prima facie showing of implicit racial bias has been made. We therefore caution that a careful and thorough inquiry is required.

A "prima facie showing" is defined similarly here as it is in other contexts: "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). However, unlike many other contexts, a particularly careful inquiry is necessary because implicit racial bias does not reveal itself in "racially charged remarks or race-based derision." *Berhe*, No. 75277-4-I, slip op. at 29. That would be *explicit* racial bias. *Implicit* racial bias, meanwhile, manifests in apparently race-neutral explanations for actions and decisions that were, in fact, influenced by unconscious racial bias. *Saintcalle*, 178 Wn.2d at 49.

22

Thus, when determining whether there has been a prima facie showing of implicit racial basis, courts cannot base their decisions on whether there are equally plausible, race-neutral explanations. There will almost always be equally plausible, race-neutral explanations because that is precisely how implicit racial bias operates.

At the prima facie stage, courts must limit themselves to determining whether the evidence, taken as true, permits an inference that an objective observer who is aware of the influence of implicit bias could view race as a factor in the jury's verdict. Where the evidence is unclear or equivocal, as it will often be in cases of alleged implicit racial bias, the court must conduct further inquiries before deciding whether a prima facie showing has been made, for example, by asking the juror making the allegations to provide more information or to clarify ambiguous statements. Any such inquiry must occur on the record and be overseen by the court rather than driven by counsel.

D.    Here, the trial court failed to adequately conduct and oversee an inquiry into the allegation that racial bias was a factor in the jury's verdict

We recognize that the court and counsel in this case did not have the benefit of the above guidelines when Berhe moved for a new trial. Nevertheless, applying the procedures and standards set forth above, we must hold that the trial court abused its discretion by failing to exercise sufficient oversight and by failing to conduct a sufficient inquiry before determining that Berhe had not made a prima

facie showing that racial bias influenced the jury's verdict. We therefore vacate the trial court's order denying Berhe's motion for a new trial and remand for further proceedings consistent with this opinion.

As noted in the factual summary above, it is not clear from the record when the trial court or the State became aware that juror 6 alleged that racial bias was a factor in the verdict. However, the most reasonable inference is that neither the court nor the State knew of these allegations until Berhe filed his motion for a new trial on March 28, 2016. For instance, on March 10, 2016, the court noted that the defense's generic allegations of "juror misconduct and prosecutorial misconduct" were "basically all we know." VRP (Mar. 10, 2016) at 3. In addition, the other jurors' declarations denying that race played a role in their deliberations were all dated April 3 or April 4, 2016. It is thus reasonable to infer that the prosecutors learned of juror 6's allegations and formulated their questions only after receiving Berhe's motion for a new trial.

This process should not have been allowed to occur. Defense counsel should have notified the court and the State that juror 6 was alleging racial bias as soon as they discovered sufficient facts to support the allegation so that the court could take control of the inquiry. Once the court became aware of juror 6's allegations, counsel should have been instructed to have no further communications with any of the jurors regarding alleged racial bias unless it was

24

on the record and overseen by the court. Without such oversight, the prosecutors in this case were able to formulate and pose two questions—(1) "Did you personally do anything to Juror #6 which was motivated by racial bias during deliberations?" and (2) "Did you observe any other juror do anything to Juror #6 which appeared to be motivated by racial bias during deliberations?" This created a natural tendency to craft written submissions in a way that best supports counsel's argument and impedes the fact-finding process, an example of the requisite importance for verbal testimony on the record overseen by the court.

In addition, the trial court did not conduct an adequate inquiry before deciding that Berhe had not made a prima facie showing requiring an evidentiary hearing. We do not reach the issue of whether a prima facie showing is made in this case, as that determination must be made by the trial court in the first instance in accordance with the standards described above. However, we do hold that the evidence in the record is at least sufficient to require further inquiry.

Juror 6's declaration includes allegations that go beyond her "subjective feeling." CP at 406. She declared that even though four members of the jury were initially not inclined to convict, juror 6, the only African-American, was "personally ridiculed in a way the other dissenting jurors were not." *Id.* at 475. She provided specific examples of such ridicule, including having her ideas "mocked as 'stupid' and 'illogical,'" and being accused of making "a comment on

police misconduct towards African-Americans" by asking a rhetorical question. *Id.* at 475-76. Implicit racial bias is not the only plausible explanation for this differential treatment, but it could be a permissible inference.

This inference is strengthened by certain statements in the other jurors' declarations, such as juror 11's appreciation of juror 6's "insights" about "hip-hop culture." *Id.* at 326. Juror 13's statement that juror 6 was accused of being "bias[ed] based on her history with the law" also raises concerns. *Id.* at 325. Just as it is "presumptively invalid" for an attorney to exercise a peremptory challenge against a potential juror for "having a close relationship with people who have been stopped, arrested, or convicted of a crime," jurors accusing each other of bias based on such a relationship may indicate the influence of implicit racial bias. GR 37(h)(iii).

We caution that these observations are not necessarily conclusive. The court on remand may determine that more information is needed before it can decide whether a prima facie showing is made here. For instance, to provide points of comparison, the court may wish to ask juror 6 how the other dissenting jurors were treated and how long they held out before voting to convict. The court may also wish to seek clarification of juror 6's allegation that "I was repeatedly accused of being 'partial' because I was the only African-American juror on the panel in a trial with an African-American defendant." CP at 475. This allegation is

ambiguous, as it may be based solely on juror 6's subjective impression or it may be based on specific statements by other jurors indicating explicit racial bias.

We therefore remand this case to the trial court for further proceedings. On remand, the court must conduct a thorough inquiry to determine whether there is a prima facie showing that an objective observer who is aware of the influence of implicit racial bias could view race as a factor in the verdict. If the court needs more information or clarification before it can make that determination, it should conduct further inquiry on the record before deciding. Any such inquiry must be overseen by the court rather than driven by counsel.

We recognize that significant time has passed, which may make it difficult to conduct further inquiries or to hold an evidentiary hearing if needed. We leave it to the court's discretion on remand to address such difficulties if they arise. However, the court is not permitted to deny Berhe's motion for a new trial without an evidentiary hearing based solely on the evidence already in the record.

## CONCLUSION

An allegation that explicit or implicit racial bias was a factor in a jury's verdict raises unique concerns that courts must address in order to safeguard the right to a fair trial by an impartial jury. Allegations of implicit racial bias raise further challenges beyond those presented by allegations of explicit racial bias. Therefore, when it is alleged that racial bias was a factor in the verdict, the trial

27

court must oversee and conduct a thorough investigation that is tailored to the specific allegations presented before deciding whether to hold an evidentiary hearing and before ruling on a defendant's motion for a new trial.

We hold that the trial court in this case abused its discretion by failing to exercise adequate oversight over the investigations into juror 6's allegations of racial bias and by failing to conduct a sufficient inquiry before denying Berhe's motion for a new trial without an evidentiary hearing. We therefore vacate the trial court's order denying Berhe's motion for a new trial and remand for further proceedings.

_____
Yu, J.

WE CONCUR:

_____
Fairhurst, C.J.

_____

_____
Madsen, J.

_____
Owens, J.

_____
Stephens, J.

_____
Wiggins, J.

_____
González, J.

_____
McCloud, J.

No. 95920-0

GORDON McCLOUD, J. (concurring)—I agree with the decision of the

court. As that decision clearly states, the courts cannot permit racial bias to infect

jury deliberations, so the no-impeachment rule must yield to allegations that such

bias factored into the verdict. Majority at 12-16. And as that decision also states,

Washington courts have been leaders in recognizing this and in developing

procedures to address such allegations. *Id.* at 13, 15-16. Further, I agree with the

court's ruling that those procedures must ensure that counsel's questions to jurors

should not "taint the jurors and impede the fact-finding process." *Id.* at 17.

Finally, I agree that the court must therefore supervise juror questioning, at the

appropriate time, to bar such taint from occurring.

I write separately only to underscore the importance that the court places on

proper investigation of these issues. Defense counsel have a duty to investigate

such issues in appropriate cases. *Id.* at 18 n.2. The Rules of Professional Conduct

(RPCs) generally permit this. *Id.* at 6 n.1. Our criminal and civil rules both

require that such investigation occur before the allegation of racial bias is raised in

1

a motion for a new trial. *Id.* (noting that rules permit such motions to be based on juror affidavits). Counsel's investigation[1] need not end until they have sufficient, admissible evidence—like the affidavits listed in the rules—to make an informed decision about whether a credible motion for an evidentiary hearing and motion for new trial should be filed. *See generally* CR 11(a)(1) (counsel's signature on a pleading or motion constitutes a certificate that "it is well grounded in fact," a decision to be made "after an inquiry reasonable under the circumstances").

I read the decision of the court to permit just such reasonable investigation. I therefore join it in full.

---

[1] That investigation must, of course, comply with the RPCs.

Gordon McCloud, J.