IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 82663-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| D.K.U., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — The juvenile court imposed a standard range disposition on D.K.U. after he pleaded guilty to second degree robbery. A trial court has a duty to conduct an inquiry on the record about whether implicit racial bias affected its decisions once a defendant raises the issue and provides supporting evidence. D.K.U. did not argue or present evidence to the trial court that implicit racial bias affected the juvenile court disposition.

D.K.U. suggests that if a juvenile court imposing a disposition upon a youth of color deviates from its typical approach to dispositions, then the court has a duty to explain why its disposition decision was not based upon implicit racial bias. But the evidence as to D.K.U., presented for the first time on appeal, does not reveal that implicit racial bias affected D.K.U.'s disposition. Thus, D.K.U. fails to show remand is required either for a hearing about bias or for resentencing.

We affirm.

FACTS

Lyubomirl Gural agreed online to sell a cell phone to "Chris," and they arranged to meet that evening in Kent to complete the sale.[1] Gural ended up being struck in the forehead with a pistol and robbed. One of the people who robbed Gural dropped a cell phone, and the police concluded it belonged to 15-year-old D.K.U. A security camera recording of the robbery showed D.K.U.'s face.

The State charged D.K.U. with first degree robbery while displaying a deadly weapon. D.K.U. and the State entered a plea agreement. D.K.U. would plead guilty to second degree robbery, the State would request a standard range term in Juvenile Rehabilitation Administration (JRA) custody, and D.K.U. could request an Option B alternative disposition. An Option B disposition would have suspended the term of detention on the condition that D.K.U. comply with any court-imposed sanctions and educational or treatment requirements.[2]

The State recommended that D.K.U. be placed in JRA custody for 15 to 36 weeks. It argued that D.K.U. was not a good candidate for treatment because he failed to engage with the services offered after his previous convictions for attempted second degree robbery and third degree theft. It also argued D.K.U. failed to take advantage of services offered during the pendency of the current charge and did not present evidence of his amenability to treatment. His juvenile probation officer recommended a 15 to 36 week term too, noting that D.K.U. was

---

[1] As part of his guilty plea, which he does not challenge, D.K.U. stipulated to the accuracy of the facts in the certificate for determination of probable cause.

[2] RCW 13.40.0357.

taking "very little responsibility" for the crime and was not attending school or engaging with treatment services.[3]

The defense proposed an Option B disposition that would suspend any detention. Defense counsel agreed D.K.U.'s engagement with services had been "sporadic" and "wish[ed] that there had been more progress than had been made so far."[4] But she said he had, "particularly in the last week," begun to seriously engage in treatment services after being injured 10 days earlier in a shooting.[5] She also argued that denying the Option B request would deprive D.K.U. of "continued support or accountability from the court" following his release.[6] D.K.U.'s mother asked that he not be placed in JRA custody and noted their struggles with housing instability. D.K.U. spoke, saying, "I just don't feel like I'm myself right now" and "I would really appreciate it if I can get some help."[7] No one discussed D.K.U.'s race beyond defense counsel's passing reference to "people of the Black community hav[ing] a hard time trusting the court, [and] trusting services that are connected to the court," which defense counsel mentioned to explain D.K.U.'s lack of engagement with service providers.[8] Defense counsel did not argue D.K.U.'s experiences as a Black youth caused him to mistrust court

---

[3] Report of Proceedings (RP) (Apr. 30, 2021) at 69-70.

[4] Id. at 83.

[5] Id. at 82.

[6] Id. at 83.

[7] Id. at 87.

[8] Id. at 79.

services, nor did she argue D.K.U.'s race impacted the court's sentencing decision.

The court adopted the State's recommendation and imposed a 15 to 36 week term in JRA custody. It explained that D.K.U. submitted "no real proof of amenability to treatment other than the statements made here today" and did not provide "a treatment plan of any kind" despite having had "lots of time to do that."[9] The court noted D.K.U. had not engaged in the services available prior to the disposition hearing. It was also concerned D.K.U. would be unsafe in the community because he recently had been intentionally shot. It concluded the "best, safest route" for D.K.U. was a standard range, 15 to 36 week term in JRA custody.[10]

D.K.U. appeals.

## ANALYSIS

D.K.U. argues resentencing is required because the trial court did not "explain why race did not play a factor in this sentence"[11] when the sentence "had a disproportionate effect [on youth of color]," thus requiring that it "account for why the sentence is not disproportionate" as to him.[12]

---

[9] Id. at 90.

[10] Id. at 91.

[11] Appellant's Br. at 22.

[12] Wash. Court of Appeals oral argument, State v. D.K.U., No. 82663-8-I (Mar. 11, 2022), at 19 min., 35 sec. through 19 min., 54 sec.; https://www.tvw.org/watch/?clientID=9375922947&eventID=2022031076&startStreamAt=1175&stopStreamAt=1194.

As a threshold matter, the State unconvincingly argues D.K.U. is barred from appealing his disposition because it was within the standard range. Although RCW 13.40.160(2) prohibits appeal of a standard range disposition, a defendant can appeal a court's failure to comply with a statutory procedural requirement or with the Constitution.[13] D.K.U. alleges for the first time on appeal that juvenile courts violate the due process rights of Black youths, like him, when imposing terms in JRA custody because of race-based implicit bias. Because D.K.U. alleges a violation of his constitutional rights, he has raised an appealable issue.[14]

As clarified at oral argument, D.K.U. concedes the Juvenile Justice Act, chapter 13.40 RCW, does not require that a court expressly find a defendant's race did not impact its sentencing decision.[15] Instead, he contends the due process clauses of the Fourteenth Amendment and of article I, section 12 require resentencing because the sentencing court failed to explain that implicit racial bias did not affect its decision. D.K.U. appears to argue his due process rights were impacted by the court's implicit racial bias or, at least, implicit bias within the

---

[13] See State v. Osman, 126 Wn. App. 575, 579-81, 108 P.3d 1287 (2005) (reviewing an otherwise unappealable sentence under the Sentencing Reform Act, ch. 9.94A RCW, when the defendant alleged procedural and constitutional violations).

[14] Id.; see State v. Cho, 108 Wn. App. 315, 329, 30 P.3d 496 (2001) (allegation of a juror's implicit bias can be raised for the first time on appeal) (citing RAP 2.5(a)).

[15] Wash. Court of Appeals oral argument, State v. D.K.U., No. 82663-8-I (Mar. 11, 2022), at 19 min. 55, sec. through 20 min., 20 sec., https://www.tvw.org/watch/?clientID=9375922947&eventID=2022031076&startStreamAt=1195&stopStreamAt=1220.

judicial system that influenced the court's decision.  Essentially, D.K.U. argues judicial bias affected his disposition.

Criminal defendants have a due process right to an impartial judge.[16]  The appearance of fairness doctrine requires both actual impartiality and the appearance of impartiality.[17]  The doctrine applies to judges and "other quasi-judicial decisionmaker[s]."[18]  It does not apply to probation officers or others merely presenting information to the decisionmaker.[19]

We presume trial judges properly discharge their official duties without bias or prejudice.[20]  But once a defendant presents evidence to the trial court of "'actual or potential bias,'"[21] the court is obligated to determine whether the defendant had or could have a fair and impartial hearing.[22]  When a defendant alleges "no actual bias but the possibility of bias," then they must show "'not whether the judge is actually, subjectively biased, but whether the average judge in his position is

---

[16] In re Pers. Restraint of Swenson, 158 Wn. App. 812, 818, 244 P.3d 959 (2010) (citing U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. I, § 22)).

[17] State v. Worl, 91 Wn. App. 88, 96, 955 P.2d 814 (1998) (citing State v. Post, 118 Wn.2d 596, 618, 826 P.2d 172, 837 P.2d 599 (1992); State v. Dagenais, 47 Wn. App. 260, 261, 734 P.2d 539 (1987)).

[18] Post, 118 Wn.2d at 618 (citing Hoquiam v. Pub. Emp. Rels. Comm'n, 97 Wn.2d 481, 488, 646 P.2d 129 (1982)).

[19] Id.

[20] In re Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004) (citing Kay Corp. v. Anderson, 72 Wn.2d 879, 885, 436 P.2d 459 (1967); Jones v. Halvorson-Berg, 69 Wn. App. 117, 127, 847 P.2d 945 (1993)).

[21] Swenson, 158 Wn. App. at 818 (quoting Post, 118 Wn.2d at 619).

[22] Id. (quoting State v. Dominguez, 81 Wn. App. 325, 330, 914 P.2d 141 (1996)).

'likely' to be neutral, or whether there is an unconstitutional 'potential for bias' that is 'too high to be constitutionally tolerable.'"[23]  If a defendant successfully challenges a discretionary decision for the first time on appeal by alleging judicial bias, the proper remedy is to remand for an evidentiary hearing about the alleged bias.[24]

In State v. Quijas, this court concluded a decline proceeding had been improperly conducted because the trial court failed to acknowledge or consider the possibility that implicit racial bias could influence its decision.[25]  A teenaged gang member shot and killed a 17-year-old.[26]  During the decline proceeding, the teenager presented evidence to the court that Hispanic teenagers like him were declined to adult court in a racially disproportionate manner.[27]  The court granted the State's motion to decline to adult court without acknowledging either the allegation or evidence of racially disproportionate decline decisions.[28]

---

[23] Id. at 822 (quoting Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 881, 129 S. Ct. 2252, 173 L. Ed 2d 1208 (2009)) (internal quotation marks omitted).

[24] Cho, 108 Wn. App. at 329 (citing McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 552 n.3, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) (plurality op.)); cf.  State v. Berhe, 193 Wn.2d 647, 665-69, 444 P.3d 1172 (2019) (remanding for an evidentiary hearing about the possibility of racial bias influencing a jury verdict after the defendant presented evidence sufficient to allow an inference that bias impacted the verdict).

[25] 12 Wn. App. 2d at 365.

[26] Id. at 365-67.

[27] Id. at 367.

[28] Id. at 368.

This court concluded the trial court had a duty to consider the teenager's allegation of bias and failed to do so.[29]

> Our Supreme Court has made clear that trial courts must be vigilant in addressing the threat of explicit or implicit racial bias that affects a defendant's right to a fair trial. We hold that equal vigilance is required when racial bias is alleged to undermine a criminal defendant's constitutional rights at any stage of a proceeding. When confronted by such a claim, supported by some evidence in the record, the trial court must rule.[30]

Because the teenager's allegation of bias and supporting evidence triggered the trial court's duty to hold a hearing and the court failed to do so, its decision was reversed and remanded for reconsideration.[31]

Even when a party does not expressly raise the issue of judicial bias, the presumption of judicial impartiality can be overcome on appeal when the court misapplies a legal standard and the record reveals the influence of implicit racial bias.

In Matter of Dependency of K.W., our Supreme Court recently reversed a child placement decision and concluded the trial court abused its discretion because it gave "inappropriate weight to [child placement] factors that serve as proxies for race" and failed to give appropriate weight to other statutory factors.[32] The Supreme Court "condemned overreliance on similar factors in placement decisions [such as criminal history and immigration status] that can serve as

---

[29] Id. at 375.

[30] Id.

[31] Id. at 376-77.

[32] No. 99301-7, slip op. at 35-36 (Wash. Feb. 17, 2022), www.courts.wa.gov/opinions/pdf/993017.pdf.

proxies for race and class."[33] It explained "that like all human beings, judges and social workers hold biases. . . . Therefore, actors in child welfare proceedings must be vigilant in preventing bias from interfering in their decision-making."[34] When making a placement decision, courts cannot rely upon "[f]actors that serve as proxies for race . . . to deny placement with relatives with whom the child has a relationship and is comfortable."[35]

The Black child in K.W. had been placed with his grandmother from age one into kindergarten when the Department of Children, Youth, and Families (DCYF) removed him from her care.[36] DCYF did so after a social worker was concerned, incorrectly and only for a matter of hours, that the grandmother was planning on leaving the child in an unapproved relative's care for six days.[37] Despite his other relatives' fitness and ability to care for him and the child's express desire to be placed with another relative or his grandmother,[38] DCYF refused. The trial court upheld DCYF's decision. Our Supreme Court concluded DCYF made an "arbitrary and improper"[39] decision that relied upon "factors that serve as proxies for race in order to deny placement with bonded relatives."[40] For

---

[33] Id. at 29.

[34] Id.

[35] Id. (citing RCW 13.34.130(3)).

[36] Id. at 2-3, 5.

[37] Id. at 4-6.

[38] Id. at 30-31.

[39] Id. at 32.

[40] Id. at 28 (citing In re Custody of Smith, 137 Wn.2d 1, 20, 969 P.2d 21 (1998)).

example, DCYF denied placement with one aunt due solely to her prior involvement with a child welfare agency, which, "without more, can serve as a proxy for race or class, given that families of Color are disproportionately impacted by the child welfare system."[41]  Based upon the evidence in the record and the trial court's decision supporting DCYF's placement decisions, the Supreme Court reversed because "the court relied upon impermissible factors and" misapplied the statute by "fail[ing] to give meaningful preference to the relative placements [the child] requested."[42]

Here, D.K.U. alleges, for the first time on appeal, that his race could have affected his sentence because of the presence of systemic bias in the judicial system.  He does not allege actual bias by the sentencing judge.

"'[B]ias pervades the entire legal system in general and hence [minorities] do not trust the court system to resolve their disputes or administer justice evenhandedly.'"[43]  "Our case law and history of racial discrimination provide ample support" to conclude a defendant's race can influence their sentence.[44]  For

---

[41] Id. at 31-32 (citing J. Christopher Graham, Wash. State Dep't of Children, Youth & Families, 2019 Washington State Child Welfare Racial Disparity Indices Report (2020), https://www.dcyf.wa.gov/sites/default/files/pdf/reports/CWRacial DisparityIndices2019.pdf).

[42] Id. at 36.

[43] State v. Walker, 182 Wn.2d 463, 488 n.2, 341 P.3d 976 (2015) (Gordon McCloud, J., concurring) (internal quotation marks omitted) (quoting State v. Saintcalle, 178 Wn.2d 34, 42 n.1, 309 P.3d 326 (2013)).

[44] State v. Gregory, 192 Wn.2d 1, 22, 427 P.3d 621 (2018) (citing cases); see State v. B.O.J., 194 Wn.2d 314, 332, 449 P.3d 1006 (2019) (González, J. concurring) ("There is considerable evidence that bias results in harsher dispositions for children of color, and for girls of color in particular.")

example, recent data specific to King County shows that Black youths are more likely to be placed in secure detention than Caucasian youths.[45]

Considering this history and supporting statistics, we share D.K.U.'s concern about the possibility that implicit racial bias could affect youth sentencing decisions. It is because of this history that Quijas held a court cannot ignore an allegation of bias "[w]hen confronted by such a claim, supported by some evidence in the record."[46] Similarly, a trial court is required to conduct a hearing about the possibility of racial bias influencing a jury verdict once it "becomes aware of the allegations that racial bias may have been a factor in the verdict."[47]

D.K.U. did not present a bias argument or supporting evidence to the trial court. The only mention of race was limited and not specific to D.K.U. When explaining her client's lack of engagement with services, defense counsel made a passing, general reference to how some members of the Black community feel about the justice system.

> I don't think it—that it's, you know, any secret that the, you know, people of the Black community have a hard time trusting the Court, trusting services that are connected to the court, which is why it doesn't surprise me that, you know, Ms. Haile is having, you know, more and more success in connecting with [D.K.U.] and building that—that trust, and why Mr. Brown, same thing, you know, and that—that this community of—of support people are working to step up and say, "What do you need? Let me—you know, let me

---

[45] King County Gov't, Zero Youth Detention Dashboard, Leading with Race Equity (updated Dec. 20, 2021), https://tableaupub.kingcounty.gov/t/Public/views/ZYD_Dashboard2021q3/Objective3-Measure2?:embed_code_version=3&:embed=y&:loadOrderID=0&:display_spinner=no&:showAppBanner=false&:display_count=n&:showVizHome=n&:origin=viz_share_link.

[46] Quijas, 12 Wn. App. 2d at 375.

[47] Berhe, 193 Wn.2d at 662.

physically help you get the stuff that you need and get the—to get the stability that you need."

So, I mean, when it comes down to, you know, an Option B versus a JRA sentence, I really—you know, the—the Court, other than like the—the amenability to treatment, you know, and like the availability of evidence-based or research-based treatment, like there's not much else that the Court has to consider when it comes to whether or not to give [D.K.U.] an Option B before. He hasn't had an Option B in the past. He hasn't had this opportunity. And, of course, it's different than something like an MI [manifest injustice] down because that 15 to 36 weeks is still there. It's still imposed. It's just suspended.

And so, to me, I mean, I see it as, you know, a way for the Court to say, "Look, the—the crime that you committed was serious. It was a problem. Your—you know, your lack of engagement so far is not what we expect. But we're going to give you this opportunity with the heavy hand of the Court kind of hanging over your head to engage."[48]

Although defense counsel made a passing, implicit mention of D.K.U.'s race and how it could have impacted his engagement with court services, there was no allegation racial bias affected sentencing. Indeed, defense counsel told the court "there's not much else that the court has to consider" other than "amenability to treatment" and availability of treatment when deciding which disposition to impose.[49] Unlike Quijas, D.K.U. did not argue or present evidence of bias to the trial court.

The trial court acknowledged it rarely imposed a term in JRA custody instead of an alternative disposition. Parallel to the dependency in K.W., this arguably raised the possibility the court was imposing a sentence with a

---

[48] RP (Apr. 30, 2021) at 79-80.

[49] Id. at 79.

disproportionate impact for impermissible reasons related to race.  But the court provided a detailed explanation for its decision that was grounded in the sentencing statute and did not rely on proxies for race.

An Option B disposition requires that a youth comply with court-ordered treatment options,[50] and, as urged by defense counsel, the trial court was concerned about D.K.U.'s amenability to and compliance with treatment.  D.K.U. had been convicted years earlier of other thefts and an attempted second degree theft, and he failed to take advantage of multiple opportunities to engage in court-based services after not being placed in JRA custody.  He then committed the current, "very serious charge" of second-degree robbery.[51]  He failed to provide the court any "real proof of amenability [to treatment] other than the statements made here today,"[52] despite requesting an Option B alternative sentence and the court allowing him an extra 30 days after pleading guilty to prepare for the sentencing hearing.  He did not provide "a treatment plan of any kind" to support his requested disposition, in part because he did not engage with the service providers that typically write such plans.[53]  On this record, the trial court's decision and explanation were properly based upon the sentencing statute and do not give rise to an inference of racial bias.

---

[50] RCW 13.40.0357.

[51] RP (Apr. 30, 2021) at 88.

[52] Id. at 90.

[53] Id.

Unlike Quijas, D.K.U. did not trigger the trial court's duty to inquire into the possibility of bias. And unlike K.W., the trial court's decision did not rely on impermissible proxies for race to misconstrue the applicable statute. Most importantly, we see no indicia of implicit racial bias in the trial court's thoughtful explanation of its decision.

Even assuming a duty to inquire into implicit racial bias may be triggered if a court's sentencing decision has a disproportionate impact on a person of color, the record as to D.K.U., presented for the first time on appeal, does not reveal that racial bias could have influenced the court's decision. On this record, D.K.U. fails to demonstrate a violation of his due process rights. Remand is not required for a bias hearing or for resentencing.

Therefore, we affirm.

_____

WE CONCUR:

_____    _____
Mann, C.J.                  Dwyer, J.

14