**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 30, 2022

_González C.J._
CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 99959-7 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| JOSEPH MARIO ZAMORA, | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | Filed: June 30, 2022 |

JOHNSON, J.—This case involves the issue of whether the prosecutor committed misconduct when, during jury selection, he repeatedly asked the potential jurors about their views on unlawful immigration, border security, undocumented immigrants, and crimes committed by undocumented immigrants. We conclude that the prosecutor's questions and remarks apparently intentionally appealed to the jurors' potential racial or ethnic bias, prejudice, or stereotypes and

*State v. Zamora*, No. 99959-7

therefore constitute race-based prosecutorial misconduct. Joseph Zamora[1] was charged and convicted of two counts of third degree assault of a police officer, which the Court of Appeals affirmed. We reverse the Court of Appeals and vacate the convictions.

FACTS

This case arises from a violent police confrontation that escalated far beyond what should have happened. On Super Bowl Sunday, February 5, 2017, at approximately 9:30 p.m., Joseph Zamora was walking to his niece's house when a neighbor called the police to report a possible vehicle prowler.[2] When Zamora reached the driveway of his niece's home, he was contacted by responding officer Kevin Hake who indicated he needed to speak with Zamora. Hake quickly became nervous because of Zamora's demeanor, explaining that Zamora was "looking through" him with eyes the "size of silver dollars."[3] 2 Verbatim Report of Proceedings (VRP) at 321. Fearing Zamora had a weapon, Hake grabbed Zamora and attempted to restrain him. A struggle ensued and escalated to include what

---

[1] The Fred T. Korematsu Center for Law and Equality, American Civil Liberties Union of Washington, King County Department of Public Defense, Northwest Immigrant Rights Project, OneAmerica, Public Defender Association, Washington Association of Criminal Defense Lawyers, and Washington Defender Association filed a joint brief as amici curiae in support of Zamora.

[2] It is undisputed that there was no vehicle prowler.

[3] A subsequent blood test showed Zamora was positive for amphetamine, methamphetamine, and tetrahydrocannabinol (THC).

2

may be described as extreme acts of violence. Ultimately, eight officers were involved in subduing Zamora. When responding paramedics arrived, Zamora was handcuffed, hog-tied, and lying face down in the snow with two officers restraining him; he had no heartbeat or pulse. It took the paramedics seven minutes to revive him. Zamora was taken to the hospital and remained in intensive care for approximately four weeks.

A jury found Zamora guilty of two counts of third degree assault of a law enforcement officer: one count as to Officer Hake and one count as to Officer Timothy Welsh. Hake's injuries included a "couple small scratches around [his] hand and wrist" and some bruising. 3 VRP at 543. Welsh sustained an injury to his hand from punching Zamora in the back of the head multiple times. The actions of the police officers involved in the confrontation are alarming, but this case reached our court, in part, because of the concerning actions of the Grant County prosecutor during jury selection.

Grant County Prosecutor Garth Dano began voir dire by introducing the topics of border security, illegal immigration, and crimes committed by undocumented immigrants. The prosecutor repeatedly elicited potential jurors' comments and views on these topics, referring at one point to "100,000 people" "illegally" crossing the border each month. 1 VRP at 77. He began asking jurors whether they felt they were closer to choosing a side of "we have [or] we don't

have enough border security." 1 VRP at 71. He also asked jurors if they had "heard about the recent drug bust down at Nogales, Arizona where they picked up enough [of] what's called Fentanyl that would have killed 65 million Americans." 1 VRP at 139. Defense counsel Tyson Lang did not object to the prosecutor's questions and remarks on border security, illegal immigration, undocumented immigrants, and drug smuggling.

Zamora appealed his two convictions, claiming that his constitutional rights were violated in two distinct ways. First, he argues his right to an impartial jury was violated when the Grant County prosecutor appealed to jurors' potential racial bias during voir dire. Second, he contends the trial court violated his right to cross-examine adverse witnesses when it excluded testimonial evidence regarding the circumstances surrounding a Moses Lake Police Department's internal investigation into the incident.[4] Division Three of the Court of Appeals affirmed Zamora's convictions, concluding that his constitutional rights were not violated.

---

[4] Specifically, Zamora argues that the trial court's evidentiary ruling excluding reference to *Garrity* violated his right to present a defense. *See Garrity v. New Jersey*, 385 U.S. 493, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967) (holding that the officers' statements were "compelled" in violation of the Fifth Amendment to the United States Constitution (and thus inadmissible against them in a criminal prosecution) because the officers were threatened with termination if they remained silent).

4

*State v. Zamora*, No. 99959-7

We reverse the Court of Appeals on the issue of prosecutorial misconduct and vacate Zamora's convictions.[5]

## ANALYSIS

Zamora argues that the prosecutor committed race-based[6] misconduct during voir dire by appealing to ethnic or racial bias and stereotypes. The Court of Appeals agreed that the prosecutor's conduct was improper but disagreed that the improper conduct implicated ethnic or racial bias. For reasons detailed below, we conclude that during voir dire the prosecutor apparently intentionally appealed to the jurors' potential racial bias in a way that undermined Zamora's presumption of innocence. Therefore, Zamora was denied his constitutional right to an impartial jury because of the prosecutor's race-based misconduct.

---

[5] We need not reach the second issue.

[6] Throughout this opinion we use the language of "race" or "racial" when characterizing the nature of the misconduct consistent with our prior opinions on allegations of race-based misconduct in jury trials. We note, however, that these principles apply to ethnicity as well. Therefore, while "Hispanic" or "Latinx" identifies a person's ethnicity and not their race, the language of race when discussing these principles includes Hispanic and Latinx persons. The United States Supreme Court adopted this view in *Peña-Rodriguez*, noting that it has "used the language of race when discussing the relevant constitutional principles in cases involving Hispanic persons." *Peña-Rodriguez v. Colorado*, 580 U.S. ___, 137 S. Ct. 855, 863, 197 L. Ed. 2d 107 (2017); *see also About the Hispanic Population and Its Origin*, U.S. CENSUS BUREAU (last revised Apr. 15, 2022) ("[R]ace and Hispanic origin (also known as ethnicity) are two separate and distinct concepts. These standards generally reflect a social definition of race and ethnicity recognized in this country, and they do not conform to any biological, anthropological, or genetic criteria."), https://www.census.gov/topics/population/hispanic-origin/about.html [https://perma.cc/435J-8PVB].

*State v. Zamora*, No. 99959-7

An allegation of race-based prosecutorial misconduct requires a close and thorough examination of the record. Here, the prosecutor began voir dire by saying:

> So first of all, let's just take a general topic that seems to be in the media every day, and I'll ask you a general question, and that is some people say today in our society we have—we don't have enough border security. Some people say we have too much or we don't need that. So the question is which one do you feel like you're closer to? So I'm probably going to call on some people and just hear what you have to say about that.

1 VRP at 71-72. The first responding prospective juror expressed her view that we need stronger border security, and when asked to say more, she said, "I just feel like there's been a lot of stuff in the news about people that have come over that shouldn't have that are committing crimes and I feel like it didn't have to happen here." 1 VRP at 72. She was then asked whether she had a "personal concern [her]self about maybe somebody that's here illegally doing something to [her] or [her] family." 1 VRP at 72. When she replied in the negative, she was asked, "That's never been a concern to you?" 1 VRP at 72. She again said no. Another juror responded to the question of whether "we have too much border security" by saying that "[w]e don't have enough security of any kind." 1 VRP at 73. This juror added that he lived "out on the border during the wintertime" and had seen "what's going on" and that as "far as people coming in illegally, there's a right way and a wrong way. [And w]hat they're doing down there is the wrong way." 1 VRP at 73.

*State v. Zamora*, No. 99959-7

This prospective juror agreed with the sentiments expressed by the previous individual.

The prosecutor then asked if anyone saw things "differently." 1 VRP at 73. Another juror expressed that a lot of "great people" come here "look[ing] for a better opportunity" and that she thought a big, "physical rock wall is ridiculous." 1 VRP at 73, 74-75. The juror was asked what she would propose instead of a border wall. She responded that we should "continue to build communities along the southern border." 1 VRP at 75. Seemingly in response to what another person commented, she went on to state, "I haven't been a victim of a violent crime . . . [b]ut I don't believe it's just immigrants who may be leading to that." 1 VRP at 75. The prosecutor pushed back on the juror's comment that immigrants are not the sole contributors to violent crime in the United States. He said,

> Sorry for this, and I don't mean to get off on a jag, could you make room for the possibility that someone who—a loved one or family member of somebody who was either killed or had problems with somebody that's been previously deported or criminally is wrongly in the country, that that happens to them, and that they feel like we need more border security, can you make room for that?

1 VRP at 75. The prosecutor thanked the juror after she agreed, and then he moved on. The next juror said she "strongly" agreed with the opinion that "we need to do more to . . . help them . . . gain access legally" and that a "physical barrier is not going to help at all." 1 VRP at 76. The juror then expressed her concern that "people are focusing more on the race aspect instead of . . . white illegal

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

immigrants coming in." 1 VRP at 76. The prosecutor then asked, "If you don't

believe a wall would help, do you lock your door?" 1 VRP at 76. When the juror

replied that she does lock her door in order to protect herself, the prosecutor asked:

> Can you make room for the idea that when they hear that
> 100,000 people come across illegally a month, and of those we've got
> people from countries that—countries on our list that aren't even
> allowed in the country are part of that group?
> . . . .
> That they feel that we've got a big problem and a porous
> border, meaning people are just coming across and we don't know
> who is here, that a lot of people have some fear about that. Can you
> make room for that?

1 VRP at 76-77. She replied in the affirmative. The prosecutor thanked her and

then moved into a general discussion of whether jurors locked their doors at night

and whether they had ever been the victim of a robbery. But he later invited more

input about the prior "general subject" he had raised earlier, and a juror said that

she "would vote for more security at the border" but was "up in the air about the

wall." 1 VRP at 88. The prosecutor asked whether she found it "interesting that the

people that live along the border might be a little more exercised about that subject

than us here in Washington state," and when she responded in the affirmative, he

added that we "don't have to deal with that right up front and in the open." 1 VRP

at 88, 89. He later asked another juror about his thoughts on "border security, those

kinds of things," but the juror agreed that the topic had been "pretty well . . . talked

about already." 1 VRP at 92. The prosecutor asked another juror if she wanted to

8

*State v. Zamora*, No. 99959-7

add to the discussion, and she said she had "some very definite thoughts about our borders," but the court cut her off because the prosecutor had used his (first) 30 minutes of voir dire. 1 VRP at 100.

After court reconvened, defense counsel conducted his voir dire examination, during which he asked whether "anybody [would] have strong feelings" about a case that involved the "usage of drugs" or "being under the influence of drugs." 1 VRP at 179, 136. A couple jurors explained their personal circumstances involving family members who went to rehab and were negatively impacted by the "opioid situation." 1 VRP at 136. Another juror shared his opinion regarding his adult son's marijuana use.

At the beginning of the State's second 30 minutes of voir dire, the prosecutor continued with the topic of drugs. He asked one juror what his feelings were on marijuana. He said, "So being a gateway drug, what have you seen or are you aware of that it leads to other drugs[?]" 1 VRP at 139. He then asked, "Are you concerned with the methamphetamine problem?" 1 VRP at 139. The juror replied, "Extremely so. Especially in the town that I live in." 1 VRP at 139. The prosecutor responded by asking the rest of the prospective jurors, "How many people on the jury . . . heard about the recent drug bust down at Nogales, Arizona where they picked up enough [of] what's called Fentanyl that would have killed 65 million Americans[?]" 1 VRP at 139. He then asked whether this was a concern,

9

and the juror again responded, "Extremely so." 1 VRP at 140. For the remainder of his time, the prosecutor asked a variety of questions, including questions pertaining to employment, educational background, prior jury service, interactions with and expectations of police officers, and opinions on police officers, officer-involved shootings, and police use of force. He explicitly asked a juror's opinion on the "[b]order thing" once more, to which the juror replied that he shares a "similar perspective" as other jurors "when it comes to a border wall or the . . . justification for securing borders." 1 VRP at 160. Defense counsel did not object to the prosecutor's voir dire examination.

The Sixth[7] and Fourteenth[8] Amendments to the United States Constitution and article I, section 3[9] and section 22[10] of the Washington State Constitution guarantee a criminal defendant the right to an impartial jury. We have long recognized that the constitutional "right to a jury trial includes the right to an *unbiased* and *unprejudiced* jury." *State v. Davis*, 141 Wn.2d 798, 824, 10 P.3d 977

---

[7] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed . . . ." U.S. CONST. amend. VI.

[8] "No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

[9] "No person shall be deprived of life, liberty, or property, without due process of law." WASH. CONST. art. I, § 3.

[10] "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed and the right to appeal in all cases . . . ." WASH. CONST. art. I, § 22.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(2000) (emphasis added). As a quasi-judicial officer and a representative of the State, a prosecutor owes a duty to a defendant to see that their rights to a constitutionally fair trial are not violated. Thus, a claim of prosecutorial misconduct directly implicates the constitutional right to a fair trial.

Generally, to prevail on a prosecutorial misconduct claim, a defendant who timely objects must prove that the prosecutor's "'conduct was both improper and prejudicial in the context of the entire trial.'" *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020) (quoting *State v. Walker*, 182 Wn.2d 463, 477, 341 P.3d 976 (2015)). Where a defendant fails to object, we apply a heightened prejudice standard where the defendant must also show that the prosecutor's improper and prejudicial conduct was "'so flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice.'" *Loughbom*, 196 Wn.2d at 70 (internal quotation marks omitted) (quoting *Walker*, 182 Wn.2d at 477-78). In other words, the defendant who did not object must show the improper conduct resulted in *incurable* prejudice.

When the allegation is that the prosecutor's misconduct implicated racial bias, we apply a separate analysis. We have embraced a rule that when a prosecutor "flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence," we will vacate the conviction unless the State proves beyond a reasonable doubt that

*State v. Zamora*, No. 99959-7

the race-based misconduct did not affect the jury's verdict. *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011).[11]

The "flagrant or apparently intentional" rule announced in *Monday* is a distinct rule that applies to allegations of race-based prosecutorial misconduct. Similar to the United States Supreme Court in *Peña-Rodriguez*, this court recognized that racial or ethnic bias in the justice system so "fundamentally undermines the principle of equal justice and is so repugnant to the concept of an impartial trial" that it requires a distinct set of standards. *Monday*, 171 Wn.2d at 680; *Peña-Rodriguez v. Colorado*, 580 U.S. ___, 137 S. Ct. 855, 869, 197 L. Ed. 2d 107 (2017) (highlighting that while "[a]ll forms of improper bias pose challenges to the trial process[,] . . . there is a sound basis to treat *racial* bias with added precaution" (emphasis added)); *State v. Dhaliwal*, 150 Wn.2d 559, 583, 79 P.3d 432 (2003) ("[T]heories and arguments based upon racial, ethnic and most other stereotypes are antithetical to and impermissible in a fair and impartial trial." (Chambers, J., concurring)).

In *Peña-Rodriguez*, the United States Supreme Court discussed the constitutional and historical significance of these principles. The Court held the

---

[11] Unlike the rules for general prosecutorial misconduct, the rule for race-based prosecutorial misconduct does not differentiate between a defendant who objects and one who does not object.

12

*State v. Zamora*, No. 99959-7

Sixth Amendment requires that the no-impeachment rule—the rule prohibiting inquiry into jury deliberations—give way where a juror makes a clear statement that indicates they relied on racial stereotypes or animus to convict the defendant. *Peña-Rodriguez*, 137 S. Ct. at 869 (considering the post-verdict disclosure that during deliberations, a juror expressed racial or ethnic bias against Mexican men). The Court noted that "[i]n the years before and after the ratification of the Fourteenth Amendment, it became clear that racial discrimination in the jury system posed a particular threat both to the promise of the Amendment and to the integrity of the jury trial." *Peña-Rodriguez*, 137 S. Ct. at 867. It highlighted that "'[t]he central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States.'" *Peña-Rodriguez*, 137 S. Ct. at 867 (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192, 85 S. Ct. 283, 13 L. Ed. 2d 222 (1964)).

Because the prosecutor is a representative of the State, it is especially damaging to these constitutional principles when the prosecutor introduces racial discrimination or bias into the jury system. In seeking equal and impartial justice, it is a prosecutor's duty to see that a defendant's constitutional rights to a fair trial are not violated. Therefore, "[a] prosecutor gravely violates a defendant's . . . right to an impartial jury when [they] resort[] to racist argument and appeals to racial stereotypes or racial bias to achieve convictions." *Monday*, 171 Wn.2d at 676.

13

*State v. Zamora*, No. 99959-7

"The unmistakable principle underlying these precedents is that discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" *Peña-Rodriguez*, 137 S. Ct. at 868 (quoting *Rose v. Mitchell*, 443 U.S. 545, 555, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979)). Consistent with our cases, the United States Supreme Court has emphasized that courts have made efforts to "address the most grave and serious statements of racial bias[,] . . . not [in] an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy." *Peña-Rodriguez*, 137 S. Ct. at 868. Accordingly, courts have been "called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system" and to safeguard "'a criminal defendant's fundamental "protection of life and liberty against race or color prejudice."'" *Peña-Rodriguez*, 137 S. Ct. at 867, 868 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 310, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (quoting *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 309, 25 L. Ed. 664 (1880))); *State v. Berhe*, 193 Wn.2d 647, 658, 444 P.3d 1172 (2019) (same).

These principles have ancient roots and are not limited to the proceedings of trial, as the State suggests here. The United States Supreme Court has recognized that these principles are not limited to what occurs between opening statements and

14

*State v. Zamora*, No. 99959-7

jury instructions. It has concluded that a constitutional rule to address racial or ethnic bias in the justice system is necessary even when that bias occurs during jury deliberations. *Peña-Rodriguez*, 137 S. Ct. at 869. To permit racial or ethnic prejudice to invade the jury system, at any stage of a criminal proceeding, is to damage "'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Peña-Rodriguez*, 137 S. Ct. at 868 (quoting *Powers v. Ohio*, 499 U.S. 400, 411, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991)).

Similarly, what occurs during voir dire is equally as important as what occurs during trial proceedings. Voir dire is a significant aspect of trial because it allows parties to secure their Sixth Amendment and article I, section 22 right to a fair and impartial jury through juror questioning. It serves to protect the defendant's right to an impartial jury by exposing possible biases on the part of potential jurors and by selecting a jury capable and willing to decide the case solely on the evidence. Additionally, there is an increased danger of infecting the jury with bias and prejudice when the improper conduct occurs at the jury's introduction of the case. Voir dire is the potential juror's first introduction to the case, the courtroom, the proceedings, and their responsibility as a member of a jury. The jury is, in the voir dire phase, primed to view the prosecution through a particular prism. *See Loughbom*, 196 Wn.2d at 77. When the juror pool is tainted

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

by race-based prosecutorial misconduct at the early stages of a case, the jury becomes infected in untraceable ways.

This recognition of the importance of voir dire is consistent with our decisions where we imposed certain safeguards to the jury selection process to protect the right to an impartial jury and to discover potential racial bias. *See, e.g.*, *State v. Jefferson*, 192 Wn.2d 225, 429 P.3d 467 (2018) (plurality opinion); GR 37. Further, the United States Supreme Court has cautioned that while "the Constitution at times demands that defendants be permitted to ask questions . . . during voir dire" that are designed to explore potential racial bias, we must be vigilant of how these questions "'could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.'" *Peña-Rodriguez*, 137 S. Ct. at 868, 869 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 195, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981) (Rehnquist, J., concurring in result)). Thus, we must remain wary of how the operation of voir dire may be compromised or prove insufficient in safeguarding a defendant's right to an impartial jury. *Peña-Rodriguez*, 137 S. Ct. at 868-69.

In the present case, Zamora asserts that the prosecutor invoked racial and ethnic stereotypes about Latinxs "without ever saying Latin[x]." Suppl. Br. of Pet'r at 19. He claims that the prosecutor's remarks served to inflame stereotypes, "conjuring images of Latin[x]s coming over the border at 100,000 per month,

16

*State v. Zamora*, No. 99959-7

bringing crime and drugs." Suppl. Br. of Pet'r at 19. He highlights that when jurors opined that a border wall was unnecessary, the prosecutor asked if they locked their doors at night. *See* 1 VRP at 76 ("If you don't believe a wall would help, do you lock your door?"). The prosecutor immediately reconnected the concept of locking your door to border security and personal safety, asking whether the juror could "make room for the idea that . . . we've got a big problem and a porous border, meaning people are just coming across and we don't know who is here, [and] that a lot of people have some fear about that." 1 VRP at 76-77.

Zamora characterizes this line of questioning as profoundly inflammatory and as an offensive racial and ethnic stereotype that effectively and improperly linked Zamora, a Latino, to crime and a border wall. Zamora notes that the prosecutor's questioning could have exacerbated any racial or ethnic prejudice the potential jurors may have had by encouraging them to "'make room'" for the idea that undocumented immigrants commit crimes against people's loved ones. Suppl. Br. of Pet'r at 20.

The State asserts that the prosecutor's conduct did not inject race into the case or appeal to racial bias. Resp. to Pet. for Review at 6. It argues that the prosecutor's questions and remarks on border security, unlawful immigration, undocumented immigrants, and drug smuggling fell within the scope of CrR

17

6.4(b).[12] The State further contends that the questions about unlawful immigration and border security were intended to elicit responses from jurors that would reveal how they felt about law enforcement generally because "[i]mmigration is another area of law where people often have sympathies that are supportive of those violating the law." Resp. to Pet. for Review at 6. It further explains that the prosecutor's comment about a "drug bust" in Nogales was relevant because "the case involved an issue of the defendant being under the influence of drugs." Resp. to Pet. for Review at 7. We reject the State's characterization of the questioning.

The Court of Appeals correctly concluded that the prosecutor's conduct was improper because the addition of "border security and illegal immigration as a layer to the questioning was irrelevant and unnecessarily politicized [jury selection]." *State v. Zamora*, No. 37019-4-III, slip op. at 33 (Wash. Ct. App. June 8, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/370194_unp.pdf, *review granted in part*, 198 Wn.2d 1017 (2021). However, the Court of Appeals did not apply the *Monday* rule and did not address the racial implications of the

---

[12] CrR 6.4(b) ("A voir dire examination shall be conducted [under oath] for the purpose of discovering any basis for challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges. The judge shall initiate the voir dire examination by identifying the parties and their respective counsel and by briefly outlining the nature of the case. The judge and counsel may then ask the prospective jurors questions touching their qualifications to serve as jurors in the case, subject to the supervision of the court as appropriate to the facts of the case.").

prosecutor's comments and questions, instead concluding the prosecutor's conduct

did not cause an enduring and resulting prejudice that could not have been cured.

We disagree. The prosecutor's questions and remarks implicated the defendant's

ethnicity, and viewed in context, the conduct apparently appealed to the jurors'

potential racial or ethnic bias, stereotypes, or prejudice.

Courts must be vigilant of conduct that appears to appeal to racial or ethnic

bias even when not expressly referencing race or ethnicity, such as the prosecutor's

conduct in the present case. While the prosecutor in *Monday* made express

references and attributions to a specific race,[13] we noted that "[n]ot all appeals to

racial prejudice are blatant." *Monday*, 171 Wn.2d at 678. We warned that subtle

references to racial bias are "just as insidious" and "[p]erhaps more effective."

*Monday*, 171 Wn.2d at 678. "Like wolves in sheep's clothing, a careful word here

and there can trigger racial bias." *Monday*, 171 Wn.2d at 678. This observation

informed the court's decision to adopt the "*apparently* appeals" test.

Additionally, while not all appeals to racial prejudice will be express, it is

also true that not all express mentions of race will carry the danger of appealing to

---

[13] The prosecutor in *Monday* repeatedly declared that "'[B]lack folk'" abide by an "antisnitch code" and began referring to the "'police' as 'po-leese'" during examination of a witness to "subtly, and likely deliberately," call to the jury's attention the fact that the witness was Black and to further emphasize the prosecutor's assertion that "'[B]lack folk don't testify against [B]lack folk.'" *Monday*, 171 Wn.2d at 678, 679.

jurors' potential racial bias.[14] In some cases, race or ethnicity may be relevant or even necessary to discuss within the context of trial, e.g., to discuss motive for committing race-based hate crime. Finally, the United States Supreme Court has noted that the "Constitution at times demands that defendants be permitted to ask questions about racial bias during voir dire" in an effort to ensure individuals who sit on juries are free from racial bias. *Peña-Rodriguez*, 137 S. Ct. at 868 (collecting cases). The prosecutor's conduct in this case did not include an express mention of the defendant's ethnicity as a Latino but did invoke ethnic stereotypes about Latinxs.

In this case, where the defendant has alleged prosecutorial misconduct that implicates racial or ethnic bias, we apply the *Monday* rule and ask whether the prosecutor's questions and remarks *flagrantly or apparently intentionally* appealed to jurors' potential racial bias. If the prosecutor's conduct flagrantly or apparently intentionally appealed to racial or ethnic bias, then reversal is required.

The "flagrantly or apparently intentionally" analysis embraced in *Monday* is an objective one. We have previously announced that in a general prosecutorial

---

[14] *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 834, 408 P.3d 675 (2018) (noting that the *Monday* standard "does not apply every time a prosecutor mentions race" and explaining that the prosecutor referred to Asian/Pacific Islanders when explaining the hierarchy of the defendant's gang membership in order to highlight evidence from trial that only Latinxs, such as the defendant, "could be full-fledged members," whereas non-Latinx participants of the gang could only be "associates").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

misconduct claim the prosecutor's intent is wholly irrelevant because "we do not assess a prosecutor's subjective intent when deciding whether error occurred." *Loughbom*, 196 Wn.2d at 76. Similarly, the analysis under *Monday* does not ask whether the conduct was intentional. The inquiry is whether it *appeared* intentional within the context of trial.

At oral argument, the State argued that we owe deference to defense counsel's apparent conclusion that the prosecutor's voir dire examination was reasonable as evidenced by counsel's failure to object. Similarly, the Court of Appeals reasoned that defense counsel was in a "superior position to assess whether the voir dire was harming the defense" and that he even explained to the trial court that he strategically did not object to the prosecutor's voir dire examination because he was "'not sure that [the examination] benefit[]ed the state.'" *Zamora*, No. 37019-4-III, at 34. We reject the State's argument and will not defer to defense counsel's personal opinion regarding the prosecutor's remarks.

In a similar context where the issue involved race-based peremptory challenges during voir dire, the reasons why attorneys may fail or choose not to object to conduct that is seemingly motivated by racial bias were highlighted:

> Some attorneys are concerned about alienating other prospective jurors or upsetting opposing counsel or the judge; others do not have strong feelings about keeping the challenged prospective juror on the venire and thus accept the peremptory challenge; still others will not raise an objection unless the racial discrimination is already sufficiently obvious to satisfy a demanding trial judge; and some

21

> attorneys do not raise a *Batson* [15] objection because they are engaging in racial discrimination themselves.

*State v. Saintcalle*, 178 Wn.2d 34, 92, 309 P.3d 326 (2013) (González, J., concurring). Additionally, inaction by defense counsel cannot excuse a prosecutor's misconduct. Defense counsel cannot waive his client's constitutional right to a fair trial, and we will not skirt the responsibility of upholding a defendant's constitutional right because defense counsel failed to appreciate the impropriety of the prosecutor's conduct. Therefore, it is incumbent on the trial courts to protect a defendant's right to a fair trial, even when defense counsel fails to object to conduct that is flagrantly or apparently intentionally appealing to racial or ethnic bias.[16]

While we have embraced an objective standard for claims of prosecutorial misconduct, amici curiae asserts that our cases on race-based prosecutorial misconduct do not provide sufficiently clear guidance for ascertaining whether,

---

[15] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (holding that the State is not permitted to use its peremptory challenges to exclude potential members of the jury because of their race).

[16] In Zamora's case, the trial court expressed concern that defense counsel did not object to the prosecutor's voir dire examination. The trial court asked defense counsel to explain why he did not object to the prosecutor's "questions and comments . . . about crimes being committed by what was described as illegal immigrants passing through the United States/Mexico border." 2 VRP at 221. It noted for defense counsel that his "client has a Latin[x] last name" and warned that the State's conduct may have left the jury thinking that Zamora, "with a Latin[x] last name . . . [is] here illegally." 2 VRP at 221-22. The trial court correctly expressed concern that the prosecutor's inappropriate questions and remarks were an appeal to ethnic or racial bias.

and to whom, an appeal to racial bias is *apparent*. Amici recommends an adoption of the objective observer standard derived from *Jefferson* and GR 37 to aid in analyzing allegations of race-based prosecutorial misconduct. *Jefferson*, 192 Wn.2d 225.

We have adopted an objective observer standard in criminal cases alleging race-based *juror* misconduct[17] and jury selection practices.[18] In *Jefferson*, we modified the *Batson*[19] test to strengthen protections against racial discrimination in jury trials. We held that rather than inquiring whether the proponent of the peremptory strike was acting out of purposeful discrimination, the relevant question is whether "'an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge.'" *Jefferson*, 192 Wn.2d at 249. This objective observer standard was derived from GR 37.[20] We noted that this objective inquiry is "based on the average reasonable person—defined here as a person who is aware of the history of explicit race discrimination in America and aware of how that impacts our current decision-making in nonexplicit, or implicit, unstated, ways." *Jefferson*, 192 Wn.2d at 249-50. Furthermore, in the context of criminal trials, we have determined that when it is alleged that racial bias was a

---

[17] *Berhe*, 193 Wn.2d 647.
[18] *Jefferson*, 192 Wn.2d 225.
[19] *Batson*, 476 U.S. 79.
[20] GR 37 is not retroactive and was adopted after Jefferson's trial.

*State v. Zamora*, No. 99959-7

factor in the jury's verdict, the court must hold an evidentiary hearing if the defendant makes a prima facie showing that an objective observer—"one who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State"—could view race as a factor in the verdict. *Berhe*, 193 Wn.2d at 665. Consistent with these principles, a similar objective observer standard applies to claims of prosecutorial misconduct that implicate racial or ethnic bias.

To determine whether the prosecutor's conduct in this case flagrantly or apparently intentionally appealed to jurors' potential racial bias, we ask whether an objective observer could view the prosecutor's questions and comments during voir dire as an appeal to the jury panel's potential prejudice, bias, or stereotypes about Latinxs. The objective observer is a person who is aware of the history of race and ethnic discrimination in the United States and aware of implicit, institutional, and unconscious biases, in addition to purposeful discrimination. We assess the conduct within the context of trial. To aid in our analysis, we consider factors discussed in *Monday*, including the apparent purpose of the statements, whether the comments were based on evidence or reasonable inferences in the record, and the frequency of the remarks.

First, this was a prosecution where a citizen's mistaken report of vehicle prowling led to a violent altercation with police officers that almost resulted in the

24

*State v. Zamora*, No. 99959-7

death of the defendant who was guilty of nothing more than walking while high on drugs. This case was not remotely related to immigration—lawful or unlawful. This case had nothing to do with borders or border security. Any mention of border security, immigration, undocumented immigrants, and drug smuggling was wholly irrelevant. The State argues it had race-neutral reasons for asking these questions. Namely, to gauge the jurors' opinions on law enforcement generally. Contrary to the State's assertion, no legitimate, relevant trial purpose supports the prosecutor's questions or statements. Rather, the apparent purpose of the remarks was to highlight the defendant's perceived ethnicity and invoke stereotypes that Latinxs are "criminally" and "wrongly" in the country, are involved in criminal activities such as drug smuggling, and pose a threat to the safety of "Americans." 1 VRP at 75, 139.

Moreover, these remarks and questions were not isolated. The prosecutor asked about undocumented immigration, crime at the border, border security, and undocumented immigrants committing crime no less than 10 times during his one-hour voir dire examination. The prosecutor affirmatively and repeatedly returned to these topics, even asking jurors to "make room" for the idea that undocumented immigrants are criminals and that people have reason to fear them.

Finally, our nation's history—remote and recent—is rife with examples of discrimination against Latinxs based on ethnicity. In the 18th and 19th centuries,

25

*State v. Zamora*, No. 99959-7

institutional discrimination against Latinxs pervaded the country. Latinxs were subject to school and social segregation, barred from "white only" establishments and schools. Mob violence against Latinxs (and Latinx-appearing persons) was common, and Latinx men, women, and children alike were brutalized, tortured, and lynched by white mobs with impunity. Additionally, Latinxs were subject to illegal deportations because of their ethnicity. In the 1930s, local governments and authorities forcibly removed approximately 1.8 million people from the United States whom they *suspected* to be of Mexican descent. Nearly 60 percent of those removed were United States citizens. Erin Blakemore, *The Brutal History of Anti-Latino Discrimination in America*, HIST. (Aug. 29, 2018), https://www.history.com/news/the-brutal-history-of-anti-latino-discrimination-in-america [https://perma.cc/YB97-KDHA]; Becky Little, *The U.S. Deported a Million of Its Own Citizens to Mexico During the Great Depression*, HIST. (July 12, 2019), https://www.history.com/news/great-depression-repatriation-drives-mexico-deportation [https://perma.cc/5FUW-7J9A].

Additionally, the topics of border security at the United States-Mexico border, undocumented immigrants, and alleged criminal acts committed by immigrants were covered in the news contemporaneous with the trial. The rhetoric associated with these topics often conveyed implicit or explicit prejudices and stereotypes about Latinxs. "Anyone watching even one day of the national news

26

*State v. Zamora*, No. 99959-7

between 2016 and 2019 understood the imagery and the emotion" conjured by the prosecutor's comments on "100,000 immigrants illegally entering the United States, a border wall, illegal importation of Fentanyl, or loved ones killed by undocumented immigrants." Suppl. Br. of Pet'r at 20-21; *see also* Resp't's Answer to Br. of Amici Curiae at 8 (agreeing that "anyone watching the news between 2016 and 2019 understood the[] theme[]" of immigration).

Based on these factors, we conclude that a person who is aware of the history of race and ethnic discrimination in the United States and aware of implicit, institutional, and unconscious biases and purposeful discrimination could understand the prosecutor's questions and comments as a flagrant or apparently intentional appeal to the jurors' potential racial or ethnic bias toward Latinxs. Accordingly, we hold that the prosecutor committed race-based misconduct.

In *Monday*, we announced a burden shifting rule and embraced the harmless error standard for race-based prosecutorial misconduct claims. We established that when the prosecutor's conduct flagrantly or apparently intentionally appealed to jurors' potential racial bias, the defendant need not establish prejudice. We recognized that this particular type of prosecutorial misconduct inherently prejudices the defendant. We also acknowledged that the very existence of appeals by a prosecutor to racial or ethnic bias demands standards to deter such conduct. Therefore, we established that when a defendant shows that the prosecutor

27

*State v. Zamora*, No. 99959-7

committed race-based misconduct, the burden shifts to the State to prove the misconduct was harmless beyond a reasonable doubt. We modify this harmless error standard and conclude that when a prosecutor flagrantly or apparently intentionally appeals to a juror's potential racial or ethnic prejudice, bias, or stereotypes, the resulting prejudice is incurable and requires reversal. This conclusion is consistent with our constitutional principles and reasoning discussed in *Monday*.

In *Monday*, we correctly identified the inherent and grave prejudicial nature of state-sanctioned invocation of racial bias in the administration of justice. We recognized that the "gravity of [a] violation of article I, section 22 and Sixth Amendment principles by a prosecutor's [apparently] intentional appeals to racial prejudices cannot be minimized or easily rationalized as harmless." *Monday*, 171 Wn.2d at 680. We further emphasized that such appeals to racial bias "necessarily seek to single out one racial minority for different treatment," thereby "fundamentally undermin[ing] the principle of equal justice." *Monday*, 171 Wn.2d at 680. Thus, we embraced the harmless error standard in an attempt to deter this type of misconduct that is so "repugnant to the concept of an impartial trial." *Monday*, 171 Wn.2d at 680.

However, *Monday* recognized that "[i]f our past efforts to address prosecutorial misconduct have proved insufficient to deter such conduct, then we

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

must apply other tested and proven tests." 171 Wn.2d at 680. As evidenced by the prosecutor's actions and arguments in this case, as well as the Court of Appeals opinion affirming Zamora's convictions, *Monday*'s past effort to address race-based prosecutorial misconduct by applying a harmless error standard has proved insufficient to deter such conduct. Therefore, in order to "enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system" and safeguard "'a criminal defendant's fundamental "protection of life and liberty against race or color prejudice,"'" we revisit *Monday*'s harmless error standard. *Peña-Rodriguez*, 137 S. Ct. at 867 (quoting *McCleskey*, 481 U.S. at 310 (quoting *Strauder*, 100 U.S. (10 Otto) at 309)); *Berhe*, 193 Wn.2d at 658 (same). In its place, we adopt the tested and proven rule of automatic reversal.

The application of the harmless error standard in *Monday* is congruent with the conclusion that race-based prosecutorial misconduct necessarily results in incurable prejudice and thus cannot be deemed harmless. In *Monday*, we concluded that the misconduct was not harmless despite the overwhelming evidence of the defendant's guilt. The concurrence in *Monday* highlighted this tension, declaring that "[r]egardless of the evidence against this defendant a criminal conviction must not be permitted to stand on such a foundation." 171 Wn.2d at 685 (Madsen, C.J., concurring). It added further that

> [r]ather than engage in an unconvincing attempt to show the error here
> was not harmless, the court should hold instead that the prosecutor's

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

injection of racial discrimination into this case *cannot be countenanced at all*, not even to the extent of contemplating to any degree that the error might be harmless.

*Monday*, 171 Wn.2d at 682 (Madsen, C.J., concurring) (emphasis added). We

agree.

The state-sanctioned invocation of racial or ethnic bias in the justice system

is unacceptable. Accordingly, we hold that the prosecutor in this case committed

race-based misconduct during voir dire, and the resulting prejudice to the

defendant is incurable and requires reversal.

We reverse the Court of Appeals and reverse and vacate the convictions.

_____
Johnson, J.

WE CONCUR:

_____
González, C.J.

_____
Gordon McCloud, J.

_____
Madsen, J.

_____
Yu, J.

_____
Owens, J.

_____
Montoya-Lewis, J.

_____
Stephens, J.

_____
Whitener, J.

30

*State v. Zamora*, No. 99959-7 (González, C.J., concurring)

No. 99959-7

GONZÁLEZ, C.J. (concurring) — I concur with, and have signed, the majority

opinion. The case before us is one where the jury was asked to decide, among other

things, whether Joseph Zamora, a United States citizen, assaulted a police officer's

knuckles with the back of his head. Given the procedural posture of this case, the

factual determinations by the jury are usually given great deference. Given the

overt bias displayed by the State and infecting the proceedings in this case,

however, we must reverse and vacate the conviction.

I write separately to emphasize that bias, intentional and unintentional,

persists among some residents of Washington against people they perceive as

immigrants from countries south of the United States. Such bias also exists in the

former elected prosecutor who handled this case and whose voir dire questions

infected the proceedings. These negative attitudes have existed even in people we

1

*State v. Zamora*, No. 99959-7 (González, C.J., concurring)

admire. President Abraham Lincoln, for example, referred to the people of Mexico derisively as "mongrels" when he was running for the United States Senate in Illinois in 1858. POLITICAL DEBATES BETWEEN ABRAHAM LINCOLN AND STEPHEN A. DOUGLAS IN THE CELEBRATED CAMPAIGN OF 1858 IN ILLINOIS 282 (1895). We need not go back that far to find examples in our own state. It would be naïve to think we are immune from this bias or that such attitudes never color court proceedings. In this context, it is disingenuous for the State's representative to stand before this court and defend the prosecutor's conduct in this case, which was a clear attempt to direct such negative attitudes toward Mr. Zamora.

Washington law forbids discrimination on the basis of national origin. RCW 49.60.030. Attorneys violate both the law and the Rules of Professional Conduct when they discriminate on the basis of national origin. *Id.*; RPC 8.4(g); *In re Disciplinary Proceeding Against McGrath*, 174 Wn.2d 813, 833, 280 P.3d 1091 (2012). Prosecutors have an obligation to ensure that the defendants they prosecute receive a constitutional fair trial. *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011) (citing *State v. Case*, 49 Wn.2d 66, 70-71, 298 P.2d 500 (1956)). "A prosecutor gravely violates a defendant's Washington State Constitution article I, section 22 right to an impartial jury when the prosecutor resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions." *Id.* That happened here. Mr. Zamora deserves relief.

2

*State v. Zamora*, No. 99959-7 (González, C.J., concurring)

With these observations, I respectfully concur.

González, C.J.

Montoya-Lewis, J.