IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

SHELLA SIMBULAN, married woman, RONALD SIMBULAN, SR., as an individual and as Personal Representative of the ESTATE OF RONALD SIMBULAN, JR.,

                Respondents,

        v.

NORTHWEST HOSPITAL AND MEDICAL CENTER,

                Petitioner.

No. 85114-4-I

DIVISION ONE

PUBLISHED OPINION

HAZELRIGG, A.C.J. — Shella and Ronald Simbulan Sr., in their individual capacities and as personal representatives of the estate of Ronald Simbulan Jr., filed a wrongful death complaint against Northwest Hospital and Medical Center and alleged its medical negligence caused the death of their newborn son. Following a trial spanning nearly three weeks, the jury entered a verdict in favor of the hospital. Relying on our Supreme Court's opinion in *Henderson v. Thompson,*[1] the Simbulans moved for a new trial under CR 59 on the basis that the verdict was affected by bias against their Filipino heritage and emigration from the Philippines. The trial court determined the Simbulans established a prima facie showing of bias under GR 37 and ordered an evidentiary hearing pursuant to *Henderson.* Because no objective observer could conclude that the verdict here was affected by bias

---

[1] 200 Wn.2d 417, 518 P.3d 1011 (2022), *cert. denied*, 143 S. Ct. 2412 (2023).

based on race, ethnicity, or country of origin, the Simbulans failed to establish a prima facie showing and the trial court erred when it ordered an evidentiary hearing. Accordingly, we reverse and remand.

FACTS

On November 13, 2019, Shella and Ronald (Ron) Simbulan sued Northwest Hospital and Medical Center (NW Hospital) and claimed that its medical negligence resulted in the wrongful death of their child, Ronald Simbulan Jr.[2] The complaint was based on circumstances that arose on December 9, 2017, when Shella went into labor with Ronald Jr. (referred to by his parents as Ronnie) who suffered from shoulder dystocia[3] during the delivery at NW Hospital. According to the Simbulans, NW Hospital physician Anita Tiwari "failed to execute maneuvers correctly, or to timely attempt secondary intervention such as a Zavanelli [maneuver],[4] an emergency [c]aesarian section or an abdominal rescue when initial maneuvers did not resolve the shoulder dystocia." Ronnie passed away on December 10, 2017.

On September 1, 2022, following jury selection and motions in limine, the case proceeded to trial. The jury heard testimony from numerous witnesses who were present during Ronnie's delivery at NW Hospital, including the obstetricians who delivered him, Tiwari and Dr. Anna Panighetti, two registered nurses who

---

[2] Because they all share the same last name, we refer to the Simbulans by first name as needed for clarity. No disrespect is intended.

[3] An obstetric emergency that occurs when the shoulder of the infant becomes stuck in the mother's pelvic bones, delaying and complicating vaginal delivery.

[4] An expert for the Simbulans, Dr. Martin Gubernick, described the Zavanelli maneuver as a technique where a doctor "flex[es] the baby's head, that means [the doctor] bring[s] the chin to the chest[,] . . . cup[s] the head, and . . . push[es] the baby back to the point that . . . the head [is brought] back through the vagina and back into the uterus."

assisted in the process, and both Shella and Ron. One expert witness who testified on behalf of the Simbulans opined that Tiwari violated the standard of care in her delivery of Shella and Ron's child and the other expert stated that Tiwari's "failure to perform a Zavanelli maneuver in a timely fashion contributed to the severe hypoxic ischemic encephalopathic injury and ultimate death of [Ronnie]." The defense expert disagreed and concluded that Tiwari met the standard of care and neither did nor failed to do "anything t[hat] contribute[d] to the death." At the conclusion of the eight-day trial, conducted over three weeks, the jury found that Tiwari was not negligent and returned a verdict in favor of NW Hospital on September 19, 2022.

On October 20, our Supreme Court issued its opinion in *Henderson v. Thompson*, 200 Wn.2d 417, 518 P.3d 1011 (2022), *cert. denied,* 143 S. Ct. 2412 (2023). Shortly thereafter, on November 7, the Simbulans moved for a new trial under CR 59(a).[5] Relying on *Henderson*, the Simbulans argued that "[c]ombining defense counsel's conduct with the fact that Ron and Shella Simbulan testified through Tagalog interpreters, an objective observer could view race and/or national origin as discriminating factors in the verdict." The Simbulans contended that they "clearly met" the standard articulated in *Henderson* which requires a prima facie showing that an objective observer could view race as a factor in the verdict. In its opposition to the motion, NW Hospital contended that the Simbulans failed to satisfy their initial burden.

---

[5] The Simbulans raised two independent grounds for a new trial; instructional error and racial bias. Only the latter is before this court.

Following a hearing on the motion for a new trial, the court entered a written order that granted[6] the Simbulans' motion for an evidentiary hearing under *Henderson*. In its order, the court set out the *Henderson* standard for successfully presenting a prima facie claim and determined that the Simbulans "have shown that an objective observer who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State, *could* view race as a factor in the verdict here." As the court found the Simbulans carried their burden to make the initial showing, it ruled that an evidentiary hearing was required pursuant to *Henderson*. Quoting *Henderson*, the trial court provided that, at the evidentiary hearing, it would presume racial bias affected the verdict and NW Hospital would have the burden of proving that racial bias had "no effect on the verdict." If NW Hospital were to fail to meet its burden, then a new trial would be ordered under CR 59(a)(9).

NW Hospital timely appealed the order and this court granted discretionary review.[7]

ANALYSIS

I.      Postverdict Claim of Jury Bias and *Henderson* Standard

NW Hospital's sole assignment of error is that the trial court's determination that the Simbulans made a prima facie showing that an objective observer could

---

[6] The trial court denied the motion for a new trial based on the asserted instructional error.

[7] The Simbulans filed a notice of cross appeal on the denial of the portion of their motion for a new trial that was based on the alleged instructional error. In their opening brief, however, the Simbulans note that, as this court converted NW Hospital's appeal to a motion for discretionary review, the Simbulans' cross appeal on the purported instructional error is not presently before this court.

view race as a factor in the verdict was erroneous, and therefore, ordering an evidentiary hearing on that basis was improper.

In *Henderson*, the court explained that a civil "verdict affected by racial bias is incompatible with substantial justice and requires a new trial under CR 59(a)(9)." 200 Wn.2d at 434. The *Henderson* court drew on the two-step inquiry it had announced in *State v. Berhe*[8] to determine whether racial bias affected the verdict. *Id.* Under that standard, "the court must grant an evidentiary hearing upon a prima facie showing of evidence that, if 'taken as true, permits an inference that an objective observer who is aware of the influence of implicit bias could view race as a factor in the jury's verdict.'" *Id.* (quoting *Berhe*, 193 Wn.2d at 666). Adopting the "objective observer" standard it had first articulated in GR 37, the court explained in *Henderson* that there was no reason to "tolerate a lesser standard of justice in a civil setting than what we require in a criminal setting." *Id*. at 435. Thus, the court continued, "we apply a similar framework when a civil litigant seeks a new trial on the basis that racial bias affected the verdict." *Id*.

The *Henderson* court then established that the appropriate inquiry in such circumstances is as follows:

> We hold that upon a motion for a new civil trial, courts must ascertain whether an objective observer who is aware that *implicit, institutional, and unconscious biases, in addition to purposeful discrimination*, have influenced jury verdicts in Washington State *could* view race as a factor in the verdict. When a civil litigant makes a prima facie showing sufficient to draw an inference of racial bias under this standard, the court must grant an evidentiary hearing to determine if a new trial is warranted. At the hearing, the trial court is to presume that racial bias affected the verdict, and the party benefiting from the alleged racial bias has the burden to prove it did *not*. If they cannot prove that racial bias had no effect on the verdict, then the verdict is

---

[8] 193 Wn.2d 647, 665-69, 444 P.3d 1172 (2019).

incompatible with substantial justice, and the court should order a new trial under CR 59(a)(9).

*Id.* (citations omitted).

### A. Circumstances Considered in *Henderson*

It is beneficial here to review the particular facts and procedural framework that gave rise to our Supreme Court's *Henderson* test. "Janelle Henderson, a Black woman, and Alicia Thompson, a white woman, were involved in a motor vehicle collision." *Id*. at 422. Henderson had a preexisting condition, Tourette's syndrome,[9] and "claimed the injury and stress from the collision seriously exacerbated her symptoms." *Id*. at 423. She filed suit against Thompson and requested approximately $3.5 million in damages. *Id*. at 423-24. As Thompson admitted fault in the collision, the sole issue at trial was damages. *Id*. at 423.

"Henderson's lead trial counsel was a Black woman; Thompson's was a white woman. The judge was a white woman, and there were no Black jurors. The only Black people in the courtroom were Henderson, her attorney, and her lay witnesses." *Id*.[10] Henderson testified that since the collision, the symptoms she experienced due to Tourette's syndrome had increased and she had "new and more intense tics and severe pain." *Id.* at 424. The testimony of Henderson's

---

[9] "[A] neurological disorder characterized by repetitive, involuntary movements and vocalizations called 'tics.'" *Henderson,* 200 Wn.2d at 423.

[10] By contrast, NW Hospital notes that here, of the 15 jurors who were seated in this case, three identified as Asian, one as Black, one as Hispanic, and three jurors reported that they were born outside the United States.

In response, the Simbulans argue that these factors "are not relevant to this [c]ourt's review of whether bias could have affected the verdict" but "may be relevant at the evidentiary hearing." (Emphasis omitted.) The Simbulans offer no authority for this position which is contradicted by the *Henderson* court's reference to, and analysis of Henderson's prima facie claim that considered the totality of evidence at trial.

treating physicians, friends, and family members supported her claims. *Id*. Henderson called four lay witnesses who characterized her before the collision as "active and energetic" and after the collision as "plagued by chronic pain and pronounced tics." *Id.* Three of Henderson's lay witnesses were "Black women, and those witnesses each used the phrase 'life of the party' to describe Henderson prior to the collision." *Id.*[11]

During closing arguments, defense counsel attacked Henderson's credibility and that of her witnesses with multiple appeals to racial bias. *Id*. at 424, 436-38. Defense counsel described Henderson as "confrontational," "combative," and "not interested in the search for truth." *Id*. at 424-25. Defense counsel then said, "By comparison, my client took the stand, obviously feeling, I think, *intimidated and emotional*." *Id*. at 425. Thompson's attorney also "suggested that the only reason for the trial was Henderson's desire for a financial windfall." *Id.* Defense counsel told the jury that the reason for the trial about a "simple car accident" was because Henderson was asking for $3.5 million. *Id.* Further, Thompson argued the testimony of Henderson's family and friends was "inherently biased" and "suggested the [three] Black lay witnesses' shared use of a popular idiom to describe Henderson was a sign of collusion." *Id.* Additionally, defense counsel suggested that there was some impropriety in Henderson's relationship with her chiropractor because he "gave her a job in his office." *Id.* at 426. At the conclusion of trial, the jury awarded Henderson $9,200 in damages. *Id.* After the

---

[11] Thompson challenged the extent of Henderson's injuries and presented a surveillance video of Henderson from nine months after the collision, which showed her at work without any observable tics. *Henderson,* 200 Wn.2d at 424. Two of Thompson's defense experts opined that any injury from the car collision was "likely minor and resolved within about nine months." *Id.*

verdict and off the record, Henderson was asked to leave the courtroom before the jurors returned.  *Id*.

Henderson filed a motion for a new trial under CR 59.  *Id.* at 428.  In relevant part, Henderson contended that defense counsel's "biased statements in closing argument likely influenced the jury's unconscious bias."  *Id*.  Henderson and her legal team "filed declarations recalling the judge saying the jury wanted Henderson to leave the courtroom before they would exit the jury room."  *Id*.  However, the "judge said it was her own regular practice to ask parties to leave the courtroom before the jury returned after a verdict and not a request by the jury."  *Id*. at 428-29.  The trial court denied the motion for a new trial, and when the opinion in *Berhe* was issued the next day, Henderson sought an evidentiary hearing under the authority of that case, but the court denied that motion as well.  *Id*. at 428-29.

B.     Henderson's Prima Facie Showing

Our Supreme Court granted Henderson's petition for direct review and reversed.  In concluding that Henderson made a prima facie showing to require an evidentiary hearing under *Berhe*, the *Henderson* court said, "An objective observer could conclude that the themes and arguments advanced by defense counsel suggested Henderson and her witnesses were not credible because of their race, and considering the totality of the circumstances of this trial, an objective observer could therefore conclude that racism affected the verdict."  200 Wn.2d at 439.

Regarding the threshold prima facie showing, the court noted the "numerous instances that permit an inference that an objective observer could conclude race was a factor in the verdict."  *Id.* at 436.  First, during closing

argument, defense counsel repeatedly characterized Henderson as "confrontational" and "combative." *Id*. The court explained those "terms evoke the harmful stereotype of an 'angry Black woman.'" *Id*. Defense counsel then directly contrasted that portrayal of Henderson with "her depiction of Thompson as 'rightly' 'intimidated' and 'emotional.'" *Id.* That explicit juxtaposition, the court explained, distorted the roles of plaintiff and defendant by casting Thompson, who had admitted fault in the motor vehicle collision, as the victim and "invited the jury to make decisions on improper bases like prejudice or biases about race, aggression, and victimhood." *Id.* at 436-37.

Second, defense counsel's closing argument "alluded to racist stereotypes about Black women as untrustworthy and motivated by the desire to acquire an unearned financial windfall." *Id.* at 437. Specifically, the court reasoned that defense counsel's arguments that Henderson was only interested in the "opportunity for financial gain" and that "Henderson was exaggerating or fabricating her injuries appealed to these negative and false stereotypes about Black women." *Id.*

Third, defense counsel "relied on racist stereotypes about Black people and us-versus-them descriptions to undermine the credibility of Henderson and her witnesses." *Id.* This was done, the court explained, when defense counsel suggested that Henderson had likely asked the three Black lay witnesses—who each described her as "life of the party"—to lie for her. *Id.* "Intimating that the Black witnesses had joined together to lie for the Black plaintiff," the court reasoned, "could invite jurors to suspect them as a group and to make decisions

based on biases about race and truthfulness." *Id.* at 438.  Additionally, defense counsel attacked the credibility of Henderson's chiropractor by asserting that "they had more than just a doctor-patient relationship," and the court explained that argument "could open the door to speculation that plays directly on prejudice or biases about race and sexuality." *Id.*

II.     The Simbulans' Claim of Racial Bias

A.      Standard of Review

As a preliminary matter, the parties disagree on the standard of review to be applied in our consideration of whether the Simbulans made a prima facie showing entitling them to an evidentiary hearing.  Dedicating a significant portion of briefing to this issue, the Simbulans contend that we should apply the deferential abuse of discretion standard because we "must give deference to a trial court's findings and observations of conduct within its courtroom."  However, the trial court here made no credibility determinations that would require deference on review. *See State v. Tesfasilasye,* 200 Wn.2d 345, 356, 518 P.3d 193 (2022) (holding GR 37 challenge reviewed de novo when "none of the trial court's determinations apparently depended on an assessment of credibility").  Rather, the trial court acknowledged that the parties agreed there was "no intentional misconduct at trial" and noted portions of the record in which *both* parties had referenced the Simbulans' culture and background.  More critically, even assuming arguendo that the trial court's order included findings of fact, a simple reading of *Henderson* shows that our Supreme Court gave no deference to the trial judge in that case who plainly said that "it was her own regular practice to ask parties to leave the

- 10 -

courtroom before the jury returned after a verdict and not a request by the jury." 200 Wn.2d at 428-29. Not only did the *Henderson* court disregard the trial judge's finding on that matter, it ordered the case to be reassigned to another judge on remand because of "the opinions the trial judge ha[d] already expressed as to the reasons . . . Henderson was excluded from the courtroom when the jury returned its verdict." *Id.* at 440.

NW Hospital avers the standard of review is de novo because the question—whether an objective observer could conclude that racial bias was a factor in the verdict—"involves no subjective trial court discretion." We agree. Because the determination as to whether a prima facie showing has been made relies on the objective standard under GR 37 and incorporates the totality of the circumstances at trial, we review the prima facie showing de novo. *See id.* at 439 (applying objective observer standard and considering totality of circumstances to determine Henderson established prima facie showing); *Lantz v. Dep't of Soc. & Health Servs.*, 28 Wn. App. 2d 308, 311, 535 P.3d 501 (2023) (applying de novo review to trial court's denial of defendant's postverdict motion for evidentiary hearing under GR 37), *review denied,* 2 Wn.3d 1019 (2024).

Thus, the sole issue before this court is whether, considering the totality of the circumstances, the Simbulans made a prima facie showing that an objective observer could view race or ethnicity as a factor in this verdict, entitling them to an evidentiary hearing on that question. *Henderson*, 200 Wn.2d at 439. A prima facie showing is established if "the evidence, taken as true, permits an inference that an objective observer could reach this conclusion." *Id.* at 439-40. Webster's Third

New International Dictionary defines "could" as the past tense form of "can." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 517 (2002). "Can" is primarily defined as "know how to : have the skill to," but also as "be made possible or probable by circumstances." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 323 (2002). It is the latter definition that is relevant here. While this is a forgiving standard appropriate for a threshold determination, the Simbulans are only entitled to an evidentiary hearing on the question of whether racial bias actually impacted the verdict in order to aid in the resolution of their motion for a new trial if they have satisfied this initial requirement. *Id*. at 439.[12]

Our inquiry here is necessarily fact-specific as the trial court judge serves a gatekeeping function in their consideration of a motion for a new trial on this basis. This is logically true because we live in a racialized society and facts of our race, ethnicity, and nationality may well arise naturally during the course of litigation. While race is a social construct, it is a factor that is ever present in our various interactions with each other and our institutions, which is why we strive to educate ourselves about and mitigate the impact of unconscious biases. Again, the pertinent dictionary definition of "could," as the past tense version of "can," is defined as "made possible or probable by circumstances." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 323 (2002). Accordingly, the rule in *Henderson* plainly cannot mean that *any* time race or ethnicity is addressed in a jury trial, explicitly or otherwise, that the party challenging the verdict is automatically entitled to an

---

[12] As explained in *Henderson*, when a party makes a prima facie showing that an objective observer could view race as a factor in the verdict, the denial of an evidentiary hearing constitutes an abuse of discretion. 200 Wn.2d at 438.

evidentiary hearing on the question of whether racial biases impacted the outcome of the trial. To so hold would result in a separate legal standard for litigants who are Black, Indigenous, or People of Color (BIPOC) or those who require the use of interpreters, making the path to finality for their cases longer, more complicated, and more expensive than that of White, English-speaking members of our communities. No one seeking justice can, or should be required to suppress or disregard their racial or cultural identities in order to achieve timely resolution of their dispute. Simply put, "could" as used in the *Henderson* test cannot mean always.

      B.     Evidence Offered in Support of Prima Facie Claim

While *Henderson* directs that we consider the totality of the trial as it unfolded, it is also clear from established standards in similar contexts that we may only consider the evidence and argument that was before the trial court at the time of the hearing on the motion for a new trial. *See Cave Props. v. City of Bainbridge Island*, 199 Wn. App. 651, 662, 401 P.3d 327 (2017) (appellate courts "generally do not consider arguments on an issue that a party did not make in the superior court"); *Cox v. Gen. Motors Corp.*, 64 Wn. App. 823, 825-26, 827 P.2d 1052 (1992) ("The standard of review applied in reviewing an order granting a new trial depends upon the reason given for granting the motion" and "is generally limited to the trial court's reasons for granting a new trial."); RAP 9.12 (On review of an order for summary judgment, "the appellate court will consider only evidence and issues called to the attention of the trial court."). This logically flows given that we are

considering whether the moving party has met the threshold burden required in order to demonstrate entitlement to their desired relief.

The Simbulans argue that "[n]umerous instances permit an inference that an objective observer could conclude race and national origin were factors in the verdict." These include references to their ethnicity in argument and during examination of witnesses, their use of interpreters for testimony, and the fact of their own immigration status in comparison to that of one of the defense witnesses. We consider each of these arguments in turn.

1.      References To the Philippines

First, the Simbulans offer NW Hospital's opening statement where defense counsel mentioned that the Simbulans' first child was born in the Philippines. NW Hospital's attorney stated,

> This was Ms. Simbulan's second baby. Her first baby had been delivered in the Philippines in 2012, and it's what can be referred to as a twilight forceps delivery where the mother is given medication that makes her not unconscious, but fairly drugged, and forceps are used to help remove the baby and deliver it. And Ms. Simbulan had a healthy baby girl.

The Simbulans contend that this "remark framed the way jurors would consider the Simbulans, as Filipino immigrants, for the entirety of the trial." However, the Simbulans also testified on direct examination about their daughter's birth in the Philippines. Shella explained that she met and married Ron in the Philippines and directly stated that their first child was born in the Philippines.

As the trial court noted in its ruling on the motion for a new trial, defense counsel's comment about the birth was made at a point in the litigation when the

court had not yet ruled on the admissibility of certain information about the first birth. The defense argued that the circumstances and history of Shella's first delivery "were key to understanding her medical course" as to the complications she experienced with Ronnie's delivery. Prior to opening statements, the trial court had granted in part the Simbulans' motion to exclude evidence that Shella was told during her daughter's birth in the Philippines that future deliveries could be complicated. The trial judge ruled that whether Shella "should or should not have provided additional information" to Tiwari regarding her prior delivery was not relevant. However, the court did view Shella's medical history as "relevant to the possibility that there was some condition related to [Shella's] pelvis that contributed to what happened during the delivery" at NW Hospital. Thus, the trial court ruled that evidence regarding the birth in the Philippines would be admissible vis-à-vis the defense expert's opinion based on Shella's medical history, but excluded any reference to what Shella heard in the Philippines regarding her challenging first birth. Later, the court revisited and maintained this ruling. No mention of what Shella heard during the delivery of her daughter was made during trial, but a chart note from the hospital in the Philippines, with redactions consistent with this ruling, was contained in exhibit 16.

Second, the Simbulans point to a portion of defense counsel's cross-examination of Ron. They argue that references to Shella living in the Philippines while Ron was in America "invoke[d] implicit bias by implicating harmful stereotypes" such as "chain migration." The exchange in question occurred as follows:

Q.      Good afternoon, Mr. Simbulan. My name is Aida Babahmetovic. We have not met yet, but I'm here to ask you a few questions. I'm so sorry for your loss.
        My first question to you, Mr. Simbulan, is you and your wife, you were married in 2008; is that correct?

A.      Correct.

Q.      And my understanding, based on your deposition testimony and what you've testified here today, is that you and your wife weren't actually able to live in the same country for the first seven to eight years of your marriage; is that right?

A.      Correct.

Q.      You were living in the U.S., here in Washington, and she was living in the Philippines during that seven- to eight-year period?

A.      Correct.

Q.      And sounds like you guys communicated over the phone or during video calls and things like that pretty frequently; right?

A.      Correct.

Q.      And you did visit her periodically in the Philippines, while you were married, before she moved to the U.S.; is that right?

A.      Correct.

Q.      She actually became pregnant with your first child in the Philippines while you— during one of those visits; is that right?

A.      Correct.

Q.      She moved—your wife, Ms. Simbulan, moved to the U.S., moved to Washington, in April of 2016. Does that sound correct to you?

A.      Correct.

Q.      And she became pregnant with your second child in March of 2017, shortly thereafter; right?

A.      Correct.

Q.      Okay. As for your first child, her name is Faith. Did I get that right?

A.      Correct.

Q.      Faith was born in the Philippines in 2012?

A.      Correct.

Q.      About four years into your marriage?

A.      Correct.

Q.      And when your wife gave birth to Faith in the Philippines, you were not living in the Philippines? You weren't present for that delivery; correct?

A.      Correct.

Q.      You were in Washington at the time when she gave birth to your first child, Faith, in 2012?

A.      Correct.

NW Hospital asserts that these questions were relevant to rebut Ron's testimony in support of a claim for damages as he had testified that the Simbulans "were a close couple with a 'good marriage'" though the couple lived separately for years.

Third, the Simbulans identify a statement defense counsel made in closing argument when discussing a potential award for damages. The attorney for NW Hospital said,

> But if you do reach damages, you have to think about what really would be the right compensation here on something that nobody can really put a number on. So I submit to you, you could think about things of what you could fund with a verdict that would be tangible things that the Simbulans could use. College funds for their little girls, therapy for the parents if they want it, maybe family trips home to the Philippines every year to go visit their extended family and spend time with them.

The Simbulans contend that the reference to the Philippines "reminded the jury that the Simbulans are immigrants" and "explicitly suggests that the Simbulans' home isn't here in Washington."

### 2. The Simbulans' Use of Tagalog Interpreters

Both Ron and Shella testified at trial through Tagalog interpreters.[13] Though the Simbulans note that this was a necessity and an "intrinsic reality of the case," they contend that it compounded the "potential for implicit bias" and "added to the danger of a biased and unfair jury." However, the trial court found that the only testimony explicitly referencing their use of interpreters was elicited by the Simbulans themselves. At the start of Shella's testimony, plaintiffs' counsel asked

---

[13] The record establishes that the Simbulans utilized interpreters only to provide their respective testimony and not to listen to the trial or communicate with counsel.

her to identify herself for the record and then immediately engaged in the following exchange:

> Q: Now, we have an interpreter here today helping you testify. Shella, do you speak English?
> A: Yes
> Q: Is it your second language?
> A: Yes.
> Q: Why did you ask to have an interpreter to help you testify today?
> A: So that I can be clear about what I feel and about what happened.

On cross-examination, defense counsel did not inquire about or otherwise reference Shella's use of an interpreter.

Ron's use of an interpreter was addressed similarly by his attorney at the start of his direct examination:

> Q: And like your wife, you know English; is that correct?
> A: Yes.
> Q: But your first language is not English?
> A: No.
> Q: So is your easiest way to communicate effectively today through an interpreter?
> A: Yes.

Again, defense counsel did not reference the use of an interpreter during their cross-examination of Ron. Neither party mentioned the use of interpreters during closing arguments.

### 3. Tiwari's Immigration Status

The Simbulans also point to Tiwari's testimony about her immigration from India to the United States and contend that it perpetuates the "model minority" stereotype. This argument was not raised before the trial court in the hearing on the motion for a new trial. The Simbulans maintain that the "dichotomy of the

Simbulans as 'bad immigrants' and Dr. Tiwari as a 'good immigrant' is simply another layer of implicit bias that could have impacted the jury's verdict." On direct examination, defense counsel asked Tiwari why she became a doctor and Tiwari responded as follows:

> I—my early childhood, I grew up in India. My grandparents were farmers. They lived in an area that was—just had no resources. In order for you to get any kind of medical care, you had to drive hours away. And so people died of just simple things that I consider simple now that we in this country probably consider simple, but they didn't have any access to care. And I thought that that was just an unfair—unfair way to be.
> And so out of that experience, I then moved to the U.S., and I did all my education here. And I think that's what drove me to help people, help people who don't have resources to provide them with the best care possible.

The jury later asked Tiwari, "How old were you when you left India?" Tiwari responded that she "came to the U.S. in sixth grade." As NW Hospital notes in briefing before this court, neither party "made any further mention of Dr. Tiwari's ethnic origin, nationality, or citizenship."

### C. Application of Objective Observer Standard

While we recognize that the trial judge here made a diligent attempt to apply new case law with few parameters to a trial with exceedingly tragic facts, when we apply the GR 37 standard to the trial record as a whole, we conclude there is no evidence identified by the Simbulans that supports an inference from which an objective observer could conclude that the verdict was affected by bias based on country of origin, race, or ethnicity. Again, "could" cannot mean always. In stark contrast to the circumstances in *Henderson*, where the plaintiff, her counsel, and witnesses were Black and the defendant, her counsel, the judge, and the jury were

all White, the Simbulans are immigrants from the Philippines, Tiwari is an immigrant from India, and the jury included a number of individuals who self-identified as BIPOC as well as some who were born outside of the United States. Further, unlike the defense attorney in *Henderson* who claimed Henderson and her witnesses were inherently unreliable and suggested numerous racial tropes, stereotypes, and biases against Black people, NW Hospital's attorney did not attack the Simbulans' credibility based on their race, ethnicity, or immigration status and made no appeals to unconscious biases on those bases.

While the Simbulans select specific segments of the record that purportedly create an inference of bias, no objective observer could view those portions, individually or collectively, as supporting such an inference. First, the parties both referenced the Philippines and the Simbulans testified that Shella gave birth to their daughter there. While defense counsel in opening noted that the Simbulans' "first baby had been delivered in the Philippines in 2012," that was a simple fact of Shella's medical history relevant to this case and the statement was made at a point where further evidence of that fact may yet have been admitted. When Ron was asked about his relationship with Shella and the birth of their daughter, these questions were in direct response to the issue of damages and Ron's testimony that the couple had a "good marriage" even though they lived separately for years and Ron was not present during that birth. The couple's history of living apart for a significant portion of their marriage was directly relevant to their argument regarding loss of consortium as a basis for the damages award, which was expressly presented to the jury in their closing argument. Second, the Simbulans'

use of Tagalog interpreters was only mentioned by *their* attorney and, without more, the mere utilization of such necessary assistance does not create an inference of bias. The record establishes that no one mentioned the interpreters, or made any insinuations about language difference, in closing argument. And third, in regard to Tiwari, no objective observer could conclude that the physician on whom the claim of negligence is centered, by virtue of being an immigrant from India who is also a doctor, leads to an inference that the jury was biased in favor of her over the Simbulans simply because they are immigrants from the Philippines. On appeal, the Simbulans present secondary sources describing racial hierarchies and the harm of "good immigrant" and "bad immigrant" stereotypes, but no such argument was made in the trial court. In fact, the motion for a new trial does not present the issue of comparison of Tiwari's national origin to that of the Simbulans at all.

The Simbulans also rely on *State v. Bagby*, 200 Wn.2d 777, 522 P.3d 982 (2023), in which the court reversed Bagby's conviction due to race-based prosecutorial misconduct, but, like *Henderson*, that case is distinguishable. After a physical altercation at a fraternity party, the State charged Bagby with burglary, assault, malicious mischief, and harassment. *Bagby,* 200 Wn.2d at 782. At trial, Bagby was the "only Black person . . . other than his friend, Cooper. The judge, the lawyers, nearly all the witnesses, and the entire jury panel were white." *Id*. As Bagby claimed self-defense, his identity, race, ethnicity, and nationality *were not at issue*. *Id*. at 783-84. However, the prosecutor repeatedly invoked racial themes throughout trial by, for example, asking witnesses to "describe what they saw by

identifying the people involved by their race over a dozen times." *Id*. at 801, 783. In closing argument, the prosecutor identified "each witness one by one . . . as '[G]ood [S]amaritans,'" with the sole exception of Cooper, who was "the only Black witness." *Id.* at 785, 798 (alteration in original). Based on "the numerous instances of attention drawn to Bagby's race throughout the trial and the lack of connection those remarks had to the record in this case," the court held that "an objective observer could conclude that the prosecutor had apparently intentionally reinforced the stereotype that Bagby, because he is Black, was more likely to have committed the crimes for which he was charged." *Id*. at 802.

Unlike the prosecutor's repeated themes and constant irrelevant questions and arguments surrounding Bagby's race and ethnicity, NW Hospital's counsel only invoked the ethnicity and background of the Simbulans in a few isolated instances when it was directly tied to their testimony and relevant to the case. For example, NW Hospital's counsel challenged the Simbulans' claim for damages and responded to Ron's testimony about the strength of their marriage by asking Ron whether he was present during the birth of their first child in the Philippines and whether he visited Shella during the first seven or eight years of their marriage while they were living separately. Notably, it was the Simbulans' counsel who opened the trial by telling the jury that "family is absolutely everything to Ron and Shella" and "the Simbulan family is a large, loving, culturally-thoughtful, Filipino family that has, consistent with their heritage, the focus and attention of a baby being brought into the family." Unlike the prosecutor in *Bagby*, NW Hospital's counsel employed limited questions and arguments based on relevant facts that

the Simbulans put at issue in this case. And again, unlike the jury in *Bagby* which was all White, the jury here was not. While people of all racial and ethnic backgrounds are capable of harboring unconscious biases, studies have demonstrated that juries made up of people from diverse backgrounds are more likely to identify and critically examine the role bias may play in their decision-making. *See In re Pers. Restraint of Rhone,* 23 Wn. App. 2d 307, 324, 516 P.3d 401 (2022) ("Regardless of the defendant's race, studies have shown that '[d]iverse juries have longer deliberations, discuss more case facts, make fewer inaccurate statements, and members are more likely to correct inaccurate statements. In short, jury and jury pool diversity impact the equity and justice of jury verdicts.'" (quoting WASH. SUP. CT. GENDER & JUST. COMM'N, 2021: HOW GENDER AND RACE AFFECT JUSTICE NOW: FINAL REPORT 131 (Sept. 2021)); Peter A. Collins & Brooke Miller Gialopsos, *Answering the Call: An Analysis of Jury Pool Representation in Washington State,* 22 CRIMINOLOGY, CRIM. JUST., L. & SOC'Y no. 1, 2021.

The intentionally racialized framing of the arguments presented to the juries in *Henderson* and *Bagby* was purposeful, flagrant, and fully supported the extreme remedies fashioned in each of those cases. The facts here are quite different, however. If an objective observer could conclude that this record necessitated an evidentiary hearing under *Henderson*, triggering a presumption that racial bias affected the outcome at trial, future litigants may effectively be incentivized to erase their backgrounds, cultures, and races in order to increase their chances of a secure and final verdict. Equally problematic and counter to core conceptions of

- 23 -

an effective and efficient justice system, others could be tempted by such a rule to proactively introduce evidence of their own ethnicity or primary language to ensure another chance at litigation in the event of an unfavorable verdict. Neither of these outcomes is acceptable in our legal system.

While simple references to differences among individuals may trigger unconscious bias in some jurors, this court will not presume that such an impact occurs whenever a litigant acknowledges their background or culture where relevant to issues in a legal action. *See State v. Zamora*, 199 Wn.2d 698, 715, 512 P.3d 512 (2022) ("[R]ace or ethnicity may be relevant or even necessary to discuss within the context of trial" and "not all express mentions of race will carry the danger of appealing to jurors' potential racial bias."). Here, the Simbulans' immigrant status and Filipino heritage were referenced by both parties as they pertained to Shella's medical history and the Simbulans' evidence and arguments about cultural responses to grief and perspectives on therapy, and loss of consortium as related to their claim for damages. Contrary to their contention, the record shows no repeated themes that perpetuated stereotypes against the Simbulans, but rather, specific and limited questions and arguments referencing objective characteristics that were relevant to issues of liability and damages. Because no objective observer could conclude that bias based on race or ethnicity affected this verdict after consideration of the entirety of the record, the Simbulans

have not established a prima facie case in order to demonstrate entitlement to an evidentiary hearing on that question.

Reversed and remanded.

Hazelrigg, ACJ

WE CONCUR:

Smith, C.J.                    Mann, J.